(868 P.2d 546)
No. 69,399

DOYCE D. ADAMSON, *Appellant/Cross-Appellee,* v. DAVIS MOORE DATSUN, INC., and UNITED STATES FIDELITY & GUARANTY CO., *Appellees/Cross Appellants.*

302

Opinion filed February 18, 1994.

Martin E. Updegraff, of Wichita, for appellant/cross-appellee.

Don D. Gribble II and Curtis L. Perry, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, for appellees/cross-appellants.

Before PIERRON, P.J., LARSON and GREEN, JJ.

LARSON, J.: In this workers compensation case, both parties appeal.

The claimant, Doyce D. Adamson, contends it was erroneous for the trial court not to combine physical and psychological impairment ratings and enter a larger permanent partial general disability award.

The respondent and its insurance carrier, Davis Moore Datsun, Inc., (Datsun) and United States Fidelity & Guaranty Co. (USF&G), contest any increase in the trial court's disability rating. By their cross-appeal, they claim there was insufficient evidence to justify disability ratings based on injuries to the left elbow, rotator cuff tears to the left shoulder, and psychological impairment.

Adamson, predictably, argues there is medical and psychiatric testimony to support his claimed disability.

We could quickly resolve this decade-old case if the existence of substantial competent evidence to support the trial court's award were the only issue. Simply stated, and we will develop this more in the opinion, although the evidence was highly conflicting, there is persuasive medical and psychiatric testimony

sufficient to sustain the trial court's award, and the cross-appeal must be denied. However, as to the issue of combining physical and psychological impairments, neither party cites controlling Kansas authority, which requires us to examine the facts in considerable detail.

Viewed through the eyes of the respondent and insurance carrier, the facts could be summarized in one short paragraph from a statement in their brief:

"Unbelievably, this claim began with an un-united chip fracture, one-tenth the size of a thumbnail of the claimant's left radial styloid. This small chip fracture has blossomed into alleged injury to the left elbow resulting in two surgeries, alleged injuries to the left shoulder resulting in two surgeries, and an alleged psychological injury. It is the cross-appellant's position that the claimant sustained, at the most, a scheduled injury to the left hand resulting in a 5% permanent impairment of function, and that the other problems are essentially the result of the claimant playing in a racquetball league after the accident, and his overall hypochondriac nature."

Candor and fairness plus our required scope of review to view the evidence in the light most favorable to the party prevailing below, *Baxter v. L.T. Walls Constr. Co.,* 241 Kan. 588, 591, 738 P.2d 445 (1987), require that we make a more expansive review of the extensive record.

In February of 1983, Adamson, a used car salesman employed by Datsun during the long history of this case, fell while moving cars. He landed on his left shoulder and elbow and hit his left wrist on the bumper of a car.

Shortly thereafter, Adamson, who is left-handed, attempted to play racquetball but experienced pain and soreness to his left wrist, which persisted when he tried to play on subsequent occasions. In May of 1983, an orthopedic surgeon, Dr. Robert Eyster, diagnosed Adamson as having a sprained left wrist and a chip fracture of the left radial styloid, the area at the base of the thumb. Despite treatment, Adamson continued to experience numbness, swelling, and pain to his left hand and wrist.

In the late fall, another orthopedic surgeon, Dr. Robert Rawcliffe, Jr., contacted for a second opinion, diagnosed Adamson as suffering from an un-united minor fracture of the styloid process of the radius in the left wrist. Dr. Philip Mills conducted elec-

tromyographic (EMG) and nerve conduction velocity (NCV or NCT) evaluations, which failed to reveal any abnormalities.

In April of 1984, Dr. Eyster surgically removed the bone fragment from Adamson's left wrist. Adamson continued to complain of numbness from his left wrist to his left elbow. He failed to improve and in December of 1984, sought treatment from Dr. Tyrone Artz, an orthopedic surgeon, who prescribed physical therapy, the use of an elbow strap, and pain medication.

Although Adamson's left elbow showed some improvement, Dr. Mark Mandelbaum conducted EMG and NCV testing in April of 1985, which showed changes consistent with a left ulnar nerve compression at the elbow. This finding resulted in ulnar nerve transposition surgery by Dr. Artz, disclosing narrowing of the nerve at the left elbow. Adamson continued to complain of numbness and pain to the left elbow, and in September of 1985, Dr. Artz performed a second transposition surgery on the left elbow, which revealed a band of scar tissue that was removed and fatty tissue was placed around the nerve.

Adamson's left arm was casted to the shoulder after both surgeries, which required that he lay on his right shoulder. In October of 1985, he complained of discomfort to the right shoulder, which was diagnosed as bursitis and treated with cortisone injections. Adamson then complained of pain in his left shoulder a month later, and this was also diagnosed as bursitis and treated with cortisone injections. Adamson's numbness increased to his fingers, the ulnar aspect of the forearm, and the left side of his neck.

Dr. Artz referred Adamson to Drs. Carl Becker and Badie Mansour, both anesthesiologists, who administered pain block injections to both shoulders. Dr. Artz continued cortisone injections to both shoulder joints, which resulted in little relief. Dr. Artz referred Adamson to DuMont Schmidt, Ph.D., a psychologist, who began biofeedback and pain management therapy with Adamson in February 1986.

Dr. Schmidt diagnosed Adamson as suffering from somatoform pain disorder (a/k/a chronic pain syndrome), in which injury to muscles and nerves has occurred from trauma and pain continues despite negative x-rays and objective findings.

Dr. Artz continued to treat Adamson for increased shoulder pain with cortisone injections but referred him to Dr. Charles White, a specialist in physical medicine, who diagnosed chronic pain syndrome or a psychophysiologic musculoskeletal problem.

In April of 1986, Dr. Kenneth Hull, a psychiatrist, examined Adamson twice and diagnosed either conversion disorder or malingering and noted it was difficult to distinguish between the two diagnoses.

The cortisone injections continued, as did increasing amounts of pain killers and muscle relaxants. Dr. Artz cautioned that the more cortisone shots received, the greater the probability that Adamson's rotator cuff tendons could eventually rupture.

By October of 1987, Adamson was receiving psychiatric treatment from Dr. Charles Wellshear, who found substantial depression. Dr. Wellshear was convinced Adamson was not malingering and treated him for pain management and control of the depression.

In December of 1987, while attempting to spank his daughter Adamson experienced severe pain to the top of his left shoulder. An arthrogram revealed a torn rotator cuff, which Dr. Artz repaired in January of 1988. Adamson was off work for several months and while performing his prescribed exercises tore the rotator cuff tendon in a different location; that tear was surgically repaired in March of 1988. Adamson again did not work for an additional several months and experienced yet a third tear, which Dr. Artz advised should be allowed to heal by itself.

Adamson continued physical therapy, continued taking pain medication, and continued psychiatric treatment with Dr. Wellshear. However, his depression increased and he contemplated self-destruction, which resulted in his hospitalization for seven weeks in April of 1989. While hospitalized, Adamson was seen by Samuel Harrell, Ph.D., a psychologist, who diagnosed hypochondriasis and polysubstance dependence. While Dr. Harrell suspected Adamson was malingering, he noted his diagnosis was not entirely inconsistent from Dr. Wellshear's diagnosis.

In October of 1989, Adamson had a bone spur in the left shoulder near the rotator cuff surgically removed by Dr. Artz. By the end of 1989, Adamson was taking numerous muscle relaxants, receiving psychiatric counseling with Dr. Wellshear, par-

ticipating in physical therapy, and wearing a TENS unit daily. Remarkably, except when hospitalized, Adamson continued to sell used cars for Datsun, sometimes achieving top salesperson of the month.

The various medical professionals have assessed different percentages of permanent physical or psychological impairment stemming from the February 1983 injury. Dr. Rawcliffe estimated a 5% impairment of the function to the left hand, as did Dr. Eyster.

Dr. Artz first opined a 10% permanent functional impairment of the left upper extremity prior to the ruptures of the left rotator cuffs. Afterwards, because of the additional left shoulder problems, he increased the rating to 19%.

In 1987, Dr. Schmidt opined a 30% permanent psychological function impairment. Dr. Wellshear first concluded a 30% rating, which included Dr. Artz' 10% rating; he later opined that Adamson had a 21% permanent psychiatric functional impairment based upon a "global sense," stating Adamson had a 40% permanent partial disability, which included Dr. Artz' then-increased functional impairment rating of 19%.

Dr. Harrell used the American Medical Association (AMA) Guidelines for the evaluation of permanent impairment to conclude that Adamson had a permanent psychological functional impairment of 5% to 8%.

The Administrative Law Judge (ALJ) found the left shoulder injuries were not work-related, determined Adamson had a 20% psychological functional impairment, refused to combine any physical functional impairment with the 20% psychological functional impairment, and ruled that Adamson had a 20% permanent partial functional impairment to the body as a whole. The Director affirmed the ALJ's award, which Adamson appealed.

The trial court held Dr. Artz' long involvement with Adamson's treatment required his opinion be given greater weight and concluded his testimony established that the left shoulder injury and subsequent surgeries were related to Adamson's February 1983 work accident. It further found that Dr. Artz' 19% physical functional impairment rating was supported by the record but declined to combine the ratings to determine the permanent partial general disability. The court affirmed the ALJ's 20% permanent partial disability rating.

Based on the foregoing history, we now consider the two issues first described.

Substantial Competent Evidence

The scope of review of this 1983 case is well known. The trial court makes a de novo review of the agency record and has the jurisdiction and duty to make an independent adjudication of the facts and the law. *Reeves v. Equipment Service Industries, Inc.*, 245 Kan. 165, 171, 176, 777 P.2d 765 (1989). Our scope of review is to determine whether the trial court's judgment is supported by substantial competent evidence. *Dieter v. Lawrence Paper Co.*, 237 Kan. 139, 145, 697 P.2d 1300 (1985). The term "substantial evidence" when applied to workers compensation cases means evidence that possesses something of substance and relevant consequence or evidence that furnishes a substantial basis of fact from which the issues presented can be reasonably resolved. *Crabtree v. Beech Aircraft Corp.*, 229 Kan. 440, 442, 625 P.2d 453 (1981).

Datsun and USF&G ask us to ignore Dr. Artz' testimony concerning physical functional impairment and connection of the several shoulder injuries to the 1983 work accident by focusing on contrary opinions and tiny bits of inconsistencies. This loses sight of our standard of review, which requires us to search the record for evidence which supports the trial court's decision, to view the evidence in the light most favorable to the party prevailing below, and to uphold the trial court's findings even though there is evidence contrary to the decision reached by the trial court. See *Day and Zimmerman, Inc. v. George*, 218 Kan. 189, Syl. ¶ 2, 542 P.2d 313 (1975). Further, we do not judge the credibility of witnesses or determine the weight to be accorded their testimony.

Our review of the record requires the conclusion that Dr. Artz' testimony provides substantial competent evidence to support the trial court's determination that Adamson sustained a 19% physical functional impairment.

Datsun and USF&G further contend the trial court's determination that Adamson had a 20% psychological functional impairment is not supported by substantial competent evidence. They argue Adamson has failed to show his psychological prob-

lems are directly traceable to the physical injury of February 1983 and rely on contradictory analysis to support their conclusion that Adamson is a hypochondriac. They further criticize Dr. Wellshear's opinion of a 21% psychological impairment because it was not based upon the AMA Guidelines and contend if the psychological injury is compensable, it could only be to the extent of Dr. Harrell's ratings of 5% to 8%, which are based on AMA Guidelines.

"It is firmly established in this jurisdiction that traumatic neurosis, following physical injury and shown to be directly traceable to the injury, is compensable under the Workmen's Compensation Act." *Berger v. Hahner, Foreman & Cale, Inc.,* 211 Kan. 541, 544, 506 P.2d 1175 (1973). This is so even though financial, marital, or other worries may have contributed thereto. *Barr v. Builders, Inc.,* 179 Kan. 617, Syl. ¶ 4, 296 P.2d 1106 (1956).

"[T]he term 'traumatic neurosis' is a broad legal term and is not a specific psychiatric diagnosis." Kansas Workers Compensation Handbook § 5.04A, p. 5-10 (1990).

To establish a compensable claim for traumatic neurosis, the claimant must show: (1) a work-related physical injury; (2) symptoms of the traumatic neurosis; and (3) that the neurosis is directly traceable to the physical injury. *Love v. McDonald's Restaurant,* 13 Kan. App. 2d 397, Syl., 771 P.2d 557, *rev. denied* 245 Kan. 784 (1989).

After reviewing the record, we conclude Adamson has met all the requirements set forth in Love and has established a compensable claim for a work-related psychological injury.

Dr. Schmidt testified that the initial injury simply precipitated a chain of events that led to Adamson's chronic pain. Dr. Wellshear's deposition was taken on three occasions. He opined there was a clear causal connection between the somatoform pain disorder and the February 1983 work-related accident. Even Dr. Harrell's diagnosis was similar to and not totally inconsistent with Dr. Wellshear's diagnosis.

Dr. Wellshear's failure to use the AMA Guidelines when rating the extent of Adamson's psychological impairment does not invalidate his opinion. See *Racz v. Chennault, Inc.,* 418 So. 2d 413, 415 (Fla. Dist. App. 1982). We have previously recognized the subjective nature of any psychological injury. *Ruse v. State,*

10 Kan. App. 2d 508, 511, 708 P.2d 216 (1984). Although legislative changes effective July 1, 1993, require that functional impairment be established by both competent medical evidence and by utilizing "the third edition, revised, of the American Medical Association Guidelines for the Evaluation of Physical Impairment, if the impairment is contained therein," L. 1993, ch. 286, § 34, the 1993 amendments are not applicable here. The provisions of K.S.A. 44-510e(a) in effect at the time of the 1983 injury would not require usage of the AMA Guidelines.

We conclude the trial court's finding that Adamson had a 20% psychological functional impairment is supported by substantial competent evidence. The finding is within the evidence presented to the trial court. The various ratings ranged from 5% to 30%.

In light of our determination that Adamson's left elbow, left shoulder, and psychological injuries are compensable, Datsun and USF&G's contention that it should be compensated by the Workers Compensation Fund for benefits paid to or on behalf of Adamson in connection with those injuries is without merit.

Combination of physical and psychological impairment

The trial court concurred with the ALJ's finding that the physical and psychological impairments should not be combined and stated: "There appears to be no persuasive legal authority for adopting Dr. Wellshear's theory of combining the physical and psychological."

Adamson's contention in his appeal is that although not yet addressed by Kansas appellate courts, legal authority from the majority of other jurisdictions supports combining the physical and psychological injury to determine permanent partial general disability. Adamson relies on the general statement from 1B Larson's Workmen's Compensation Law § 42.22(a) p. 7-832 (1992) under "Physical-mental cases summarized":

"Conversely, when there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis, conversion hysteria, or hysterical paralysis, it is now uniformly held that the full disability including the effects of the neurosis is compensable. Dozens of cases, involving almost every conceivable kind of neurotic, psychotic, psychosomatic, depressive, or hysterical symptom, functional overlay, or personality disorder, have accepted this rule."

The cases cited by Larson to support this statement are from 36 different jurisdictions and include 5 from Kansas: *Berger v. Hahner, Foreman & Cale, Inc.,* 211 Kan. at 544; *Hayes v. Garvey Drilling Co.,* 188 Kan. 179, 360 P.2d 889 (1961); *Morris v. Garden City Co.,* 144 Kan. 790, 62 P.2d 920 (1936); *Love v. McDonald's Restaurant,* 13 Kan. App. 2d 397, Syl., 771 P.2d 557, *rev. denied* 245 Kan. 784 (1989); and *Ruse v. State,* 10 Kan. App. 2d 508.

Adamson argued in his brief that the physical and psychological ratings should be added together. While his counsel at oral argument did not abandon that contention as to the facts of this case, counsel conceded that not every determination required the physical and psychological ratings be added or "stacked," but claimed it was reversible error for the ALJ, Director, or trial court not to give consideration to both ratings in determining disability here.

Adamson points out that our Kansas courts recognize that a psychological injury is compensable when the elements of proof have been met, and when a work-related injury results in both a physical and psychological disability it is only logical to compensate for the total of both disabilities instead of allowing compensation for one to the exclusion of the other.

Datsun and USF&G respond by arguing the trial court does not have authority to stack or add the psychological impairment to the physical impairment. They contend that a psychological impairment cannot even qualify as a functional impairment because it is not a loss of physiological capability. They further argue functional impairment is strictly a loss to the physical structure of the body and compensation for psychological impairment is warranted only when it results in total work disability. Finally, they argue adding psychological impairment to physical impairment would allow Adamson to recover twice for the same underlying injury because the psychological rating encompasses the psychological impairment created by the physical injury.

The trial court's conclusion that the physical and psychological functional impairments could not be combined to obtain the total permanent partial general disability is one of law over which this court has unlimited review. See *Hutchinson Nat'l Bank & Tr.*

*Co., v. Brown,* 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988).

It is important to remember that the accident involved herein occurred prior to July 1, 1987. The version of K.S.A. 44-510e(a) in effect defined work disability:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the workman to engage in work of the same type and character that he was performing at the time of his injury, has been reduced."

The Kansas Workers Compensation Handbook § 11.050, pp. 11-8 to 11-9, explains:

"Although not specified in the statutes, case law clarified that the worker was entitled to an award based on percentage of functional disability, even though the worker's ability to engage in work of the same type and character was not reduced by the injury. In *Anderson v. Kinsley Sand and Gravel, Inc.,* 221 Kan. 191, 558 P.2d 146 (1976), the supreme court stated:

'The distinction between functional disability and work disability has been accepted by this court in most instances without explanation. Functional disability is the loss of a part of the total physiological capabilities of the human body. Work disability is that portion of the job requirements that a worker is unable to perform by reason of an injury. Work disability generally carries a higher percentage of disability than functional disability.' 221 Kan. at 195.

"In *Anderson* the Supreme Court discussed the inequitable result of a worker who sustained a substantial injury but could not relate the injury to his or her work and who would be denied benefits. The court stated such a result did not fulfill the intent of the workers' compensation act, citing recovery for loss of earning power as the basic purpose of the act. 'In accordance with this principle, we conclude a worker is entitled to recover an award equal to the percentage of his physiological capabilities lost by reason of an injury occurring within the scope of his employment. Stated more distinctly, he should recover his functional disability.' *Id.* at 196."

Although case law has referred to functional impairment as the loss of physiological capability, *Fogle v. Sedgwick County,* 9 Kan. App. 2d 129, 130, 673 P.2d 465 (1983), *aff'd* 235 Kan. 386, 680 P.2d 287 (1984), the Kansas Supreme Court has held: "There is no distinction between physical and psychological injuries for the purpose of determining whether a workman's disability from an injury is compensable." *Reese v. Gas Engineering & Construction*

*Co.,* 216 Kan. 542, Syl. ¶ 1, 532 P.2d 1044 (1975). Functional impairment may be either physical or psychological.

The Kansas cases cited by Larson all substantiate the rule that psychological injuries are compensable under the Kansas Workers Compensation Act. The Kansas Workers Compensation Handbook § 5.04A, pp. 5-11 to 5-14, sets forth the three required elements from *Love v. McDonald's Restaurant,* which we have previously set forth in this opinion. The legal premise for compensability is the familiar rule from *Berger v. Hahner, Foreman & Cale, Inc.* :

"When a primary injury under the Workmen's Compensation Act is shown to have arisen out of the course of employment *every natural consequence that flows from the injury, including a new and distinct injury, is compensable if it is a direct and natural result of a primary injury.* (Following *Jackson v. Stevens Well Service,* 208 Kan. 637, Syl. ¶ 1, 493 P.2d 264)." 211 Kan. 541, Syl. ¶ 1. (Emphasis added.)

Total disability from psychological impairment has been the result in most of the applicable reported cases, but we know of no reason why the resulting disability cannot be less than 100%. Likewise, we have found no requirement that psychological injury must result in work disability before compensation is allowed. We will not add another element to be proved by the claimant who alleges psychological disability. See *Love v. McDonald's Restaurant,* 13 Kan. App. 2d at 398.

In *Reese v. Gas Engineering & Construction Co.,* 219 Kan. 536, 537-38, 548 P.2d 746 (1976), the court stated: "In many of our prior decisions we have referred to the objective physical damage to the body suffered at the time of the accident as the 'primary injury' and to resultant physical and psychological disabilities which flow from the primary injury as new and distinct injuries."

In *Berger v. Hahner, Foreman & Cale, Inc.,* 211 Kan. 541, the scheduled injury was for the loss of an eye, but the claimant suffered traumatic neurosis or emotional overlay to the degree that he was 100% disabled psychologically. The Supreme Court determined that the uncontroverted medical evidence showed the claimant suffered a general bodily disability because of traumatic neurosis and the fact a scheduled injury was the precipitating factor of the claimant's complete disability would not limit his

recovery to the amount allowed for the scheduled injury. 211 Kan. at 546, 550.

The logic of *Berger* should be applied to Adamson's primary 1983 injury from which causally flowed physical injuries to his left elbow and left shoulder and psychological injury of somatoform pain disorder.

We hold it was erroneous not to give consideration to both the physical and psychological impairments which Adamson suffered in determining his final disability rating. We specifically disapprove the trial court's holding that there is "no persuasive legal authority for adopting Dr. Wellshear's theory of combining the physical and psychological," but we decline to hold the trial court is required to find the disability rating which Dr. Wellshear opines if there is contrary competent evidence which relates to the interaction of the physical and psychological impairments.

The disability award must be based on consideration of both physical and psychological impairment but does not require adding the two impairments to determine permanent partial general disability. It may be proper to do so if substantial competent evidence so states, but the increase, if any, which takes place when both physical and psychological impairments exist will depend upon each impairment's effect on the other.

Psychological impairment may expand or only complement and be compatible with existing physical impairment. Conversely, physical impairment may expand or only complement and be compatible with existing psychological impairment. Consideration should obviously be given to the nature and extent of work disability or of its absence.

We cannot establish any hard and fast rule to be applied when a claimant experiences both physical and psychological impairment. Each case will have to be decided on its particular facts based on the expert and lay testimony provided. The ALJ's, the Director, and the trial courts have the necessary expertise and skill to make proper determinations.

As the result of our holding as to the claimant's appeal, we reverse the trial court and remand for determination of Adamson's permanent partial general disability rating in accordance with the instructions of this opinion. The contentions of the cross-appeal are denied and we affirm the trial court's finding that there was

sufficient evidence to justify Adamson's disability rating based on injuries to the left elbow, rotator cuff tears to the left shoulder, and psychological impairment.

Reversed in part, affirmed in part, and remanded.