**Daniel R. BERNARD, Plaintiff,**

v.

**DOSKOCIL COMPANIES, INC., Defendant.**

**Civ. A. No. 92–1644–MLB.**

United States District Court, D. Kansas.

Aug. 24, 1994.

Frederick C. Davis, II, Bruce & Davis, Wichita, KS, for plaintiff.

W. Stanley Churchill, Ross A. Hollander, Martin, Churchill, Overman, Hill & Cole, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendant's motion for partial summary judgment (Docs. 44–46), plaintiff's responses (Docs. 52–53 & 60), and defendant's reply (Doc. 61).

Plaintiff brings this racial harassment employment discrimination action against his former employer, defendant Doskocil Companies, Inc. ("Doskocil"), asserting six causes of action under federal and state law: (1) discrimination and harassment on account of plaintiff's race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* (2) discrimination on account of plaintiff's race under 42 U.S.C. § 1981; (3) negligent retention under Kansas law; (4) assault and battery under Kansas law; (5) discrimination on account of plaintiff's disability under the Kansas Act Against Discrimination, K.S.A. § 44–1001, *et seq.;* and (6) intentional infliction of emotional distress under Kansas law. (Complaint, Doc. 1). Defendant seeks sum-

mary judgment on causes of action 2 through 6, and not on plaintiff's claim under Title VII. Defendant contends that plaintiff's state law claims are all precluded by the exclusive remedies provision of the Kansas Workers Compensation Act (KWCA), and that plaintiff's § 1981, negligent retention, disability discrimination, and intentional infliction of emotional distress claims all fail as a matter of law.

## SUMMARY JUDGMENT STANDARDS

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir. 1991).

The burden of proof at the summary judgment stage is similar to that at trial. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion, *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993), and the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial," *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). The court views the evidence in a light most favorable to the nonmoving party. *See, e.g., Thrasher v. B & B Chemical Co., Inc.,* 2 F.3d 995, 996 (10th Cir.1993).

## FACTUAL BACKGROUND [1]

Plaintiff is a black male in his mid–30s. He began employment as a fabrication weld-

1. The court will note that plaintiff's counsel has failed to comply with Local Rule 206(c) in setting

forth his "response" to defendant's statement of uncontroverted facts. The Rule requires a "con-

er with Reno Technology, a wholly owned subsidiary of defendant Doskocil, on March 26, 1991. Plaintiff was Reno's only black employee.

Plaintiff worked in Reno's production welding department and, from the outset of his employment there, was allegedly subjected to racially derogatory remarks and harassing conduct. Assistant foreman Marcus Pousson allegedly called plaintiff a "black boy" and said, in front of other employees, that "we don't allow your kind at the water fountain."[2] Employees allegedly told racial jokes in the break room, although apparently not in plaintiff's presence.[3] Plaintiff's co-workers frequently changed the dial settings on his arc welder while he was away from his work station and would sometimes sneak up and bang a hammer on plaintiff's table while he was working. Finally, on one particular occasion, plaintiff's leadman, Arley Philbrick, allegedly threatened to wrap a rag saturated with lacquer thinner around plaintiff's neck while plaintiff was welding. (Plaintiff's Depo., pp. 129–30; see Philbrick's Depo., pp. 34–35).

On July 31, 1991, plaintiff advised his manufacturing manager, Joe English, that he was unhappy with his working atmosphere and intended to quit his job with Reno. The next day, August 1, 1991, plaintiff met with Mr. English, foreman Michael Wyer, and Greg Roepka from Renos' Research and Development (R & D) Department to discuss plaintiff's concerns and consider alternatives to plaintiff's quitting. It was agreed that plaintiff would be temporarily reassigned to Reno's R & D department as soon as Mr. Roepka could make the necessary arrangements.[4]

On August 20, 1991, before plaintiff's transfer to R & D, another incident of alleged racial harassment occurred. On that date, when plaintiff returned to his work station after his lunch break and sat down at his welding table, a tungsten welding tip protruding vertically from his chair punctured his buttocks. Plaintiff sprang to his feet and hollered. A co-worker nearby, Mark Winchester, allegedly looked at plaintiff and laughed.[5]

Plaintiff told his leadman, Mr. Philbrick, about the injury to his buttocks. He was sent to the company nurse, Judy Schmidt, but plaintiff would not allow Nurse Schmidt to examine his buttocks. Nurse Schmidt made an appointment for an examination by Reno's company doctor, David Hanson, for the following day.

After seeing Nurse Schmidt, plaintiff met with Mr. English, Mr. Wyer, and John Heidebrecht, Doskocil's director of human resources. They discussed the circumstances surrounding the injury to plaintiff's buttocks, Mr. Pousson's alleged comment at the water

---

cise statement of material facts to which the party contends a genuine issue exists." Plaintiff's counsel's statement of facts is anything but "concise." Although he leaves uncontroverted thirty of defendant's forty enumerated statements of fact, it takes plaintiff's counsel **nearly twenty-nine double-spaced pages in a smaller font** to "respond" to the ten remaining statements. Plaintiff's counsel is admonished to follow Rule 206(c) in the future.

2. Mr. Pousson denies making the water fountain comment, but claims he merely asked plaintiff during lunch, "what are you doing at the back of the line." (English Depo., Ex. 8).

The alleged "black boy" remark appears to have been derived from the deposition testimony of Bruce Bennett, a lead man at Reno. (During his deposition, plaintiff answered "no" when asked whether Mr. Pousson had made any racially derogatory remarks other than the alleged water fountain comment. (Plaintiff's Depo., p. 248).) According to Mr. Bennett's testimony, Mr. Pousson merely jokingly stated in reference to plaintiff's and Pousson's work that it was "not bad for a black boy" (referring to plaintiff) and a "cajun from Louisiana" (referring to Mr. Pousson). (Bennett Depo., pp. 12–13).

3. According to Mr. Pousson, plaintiff participated with his co-workers in telling racial jokes in the break room. (Pousson's Depo., pp. 18–19). However, plaintiff claims he never told a racial joke and cannot remember hearing anyone else tell them. (Plaintiff's Depo., p. 250).

4. According to defendant Doskocil, "[p]laintiff made no mention during that meeting of racial slurs, jokes or harassment." (Doc. 45, pp. 3–4). Plaintiff contends that he had no reason to refer specifically to "racial harassment" because Mr. English and Mr. Wyer already knew about it. (Doc. 60, pp. 23–24).

5. Winchester apparently claims to have been laughing about another matter. (English Depo., Ex. 8; Heidebrecht Depo., p. 14).

fountain, and Mr. Philbrick's alleged threat to throw a thinner-soaked rag around plaintiff's neck.[6]

The next day, August 2, 1991, Dr. Hanson examined plaintiff's buttocks injury. Dr. Hanson found that plaintiff was physically able to perform the essential functions of his position, and plaintiff returned to his work as a welder at Reno.

On August 26, as previously agreed, plaintiff was temporarily reassigned to R & D.[7] The level of harassment lessened, but, according to plaintiff, at least two more incidents of harassment occurred: (1) plaintiff overheard another R & D employee using the term "nigger rig," (Plaintiff's Depo., pp. 247–49, 318–20); and (2) personnel in the company storeroom refused to give plaintiff needed equipment until Mr. Roepka intervened on his behalf, (Plaintiff's Depo., p. 403).

At some point, Reno apparently closed down its R & D department. Plaintiff was scheduled to return to the production welding department during the month of September, but did not come to work because he was allegedly experiencing severe pain. Dr. Hanson referred plaintiff to another Wichita doctor, Robert L. Eyster, in connection with his complaints of pain.

On November 8, 1991, Dr. Eyster sent a letter to Dr. Hanson indicating that he had examined plaintiff and found plaintiff to have "a sciatic nerve irritation, due to being hit in the sciatic notch region with a pointed object." (Doc. 53, Ex. P). Dr. Eyster concluded that plaintiff could "work within his tolerance of pain" and "should improve over the next several months." *Id.*

On November 11, Dr. Hanson completed a "Return to Work Release" form for plaintiff. (Doc. 46, Ex. 17). Dr. Hanson noted that plaintiff was experiencing "persistent pain along [his] left sciatic nerve" and prescribed the following restrictions on plaintiff's work activities: lifting limited to ten pounds; no repetitive bending, stooping, lifting, twisting, climbing or loading; and that plaintiff needed thick down padding to sit on while working. *Id.* The following day, November 12, plaintiff met with Mr. English and Nurse Schmidt concerning Dr. Hanson's work restrictions. Mr. English agreed to discuss plaintiff's situation with Mr. Breunig.

On November 13, Mr. Breunig and Mr. English met with plaintiff and informed him that he was being discharged because, under the work restrictions prescribed by Dr. Hanson, there were no jobs for which plaintiff was qualified at Reno. Plaintiff claims Mr. English and Mr. Breunig knew that despite Dr. Hanson's restrictions, he was physically able to perform work as a welder. (Doc. 60, pp. 14–18).[8]

That same day, November 13, plaintiff filed a claim against defendant for workers compensation benefits under the Kansas Workers Compensation Act (KWCA). (Doc. 46, Ex. 22). Plaintiff ultimately recovered over $14,000 in medical compensation and permanent disability benefits. (Doc. 46, Ex. 23).

### Race Discrimination Under 42 U.S.C. § 1981

In his "Second Cause of Action," plaintiff alleges that defendant has violated 42 U.S.C. § 1981, which preserves each per-

---

**6.** Mr. English investigated plaintiff's claims, interviewing a number of plaintiff's co-workers concerning the alleged incidents of racial harassment. Among those interviewed, no one admitted having any knowledge of the tungsten welding tip's being placed in plaintiff's chair. (Doc. 46, Ex. 15).

**7.** Plaintiff was able to perform all of his functions in the R & D department and, according to Mr. Roepka, did "an excellent job." (Roepka's Depo., pp. 11–13).

**8.** Dr. Hanson sent a letter to Mr. Breunig on December 5, 1991 stating:

"The consensus of Dr. Michael Patterson, Dr. Robert Eyster, and myself is that Mr. Bernard had a normal physical and neurological exam, and had **no objective findings to account for his complaint of pain.** This is significant from the standpoint that **Mr. Bernard is capable of doing any physical activity that he would desire so without causing him, in my professional opinion, any physical harm.** How long Mr. Bernard will complain of pain is indeterminate at this time."
(Doc. 46, Ex. 18) (emphasis added).

son's right to make and enforce contracts, regardless of the person's race. (Doc. 1, ¶¶ 22–25). Defendant contends it is entitled to summary judgment with respect to this cause of action.

The conduct upon which plaintiff's § 1981 claim is based occurred after the parties entered into an employment contract. In *Patterson v. McLean Credit Union*, 491 U.S. 164, 177, 109 S.Ct. 2363, 2373, 105 L.Ed.2d 132 (1989), the Supreme Court held that the protections of § 1981 do not extend to conduct by the employer after the contract relation has been established, reasoning that post-formation conduct involves the **performance** of established contract obligations, not the right to make or enforce a contract, and is thus more naturally governed by state contract law and Title VII. Thus, under *Patterson*, plaintiff's § 1981 claim necessarily fails.

As both parties concede, on **November 21, 1991,** Congress amended 42 U.S.C. § 1981 via the Civil Rights Act of 1991 to extend to post-formation conduct of an employer, effectively overruling *Patterson.* However, plaintiff's claim is predicated solely on events taking place on or before **November 13, 1991.** The Supreme Court recently held that the Civil Rights Act of 1991 cannot be retroactively applied in § 1981 cases, *Rivers v. Roadway Express, Inc.,* —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), and plaintiff's claim is thus limited to pre-amendment § 1981 and remains subject to *Patterson.* Summary judgment is accordingly granted on plaintiff's § 1981 claim.

### Negligent Retention

In his "Third Cause of Action," plaintiff alleges that defendant "failed to properly discipline employees involved in discrimination and harassment of plaintiff," "negligently retained employees subjecting plaintiff to harassment and threats of violence," and "by its action ratified the unlawful conduct of its supervisors and employees." (Doc. 1, ¶¶ 26–28). Essentially, plaintiff contends that

those in a position to make employment decisions at Reno knew that certain employees were harassing plaintiff because of his race and should not have retained those employees.

In *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.,* 249 Kan. 348, 819 P.2d 587 (1991), the Kansas Supreme Court affirmed and restated the principles governing negligent retention claims:

> When a third party asserts a negligent retention and supervision claim against an employer, liability results not because of the employer-employee relationship, but because **the employer had reason to believe that an undue risk of harm to others would exist** as a result of the employment of the alleged tortfeasor. The employer is subject to liability only for such harm as is within that risk. If therefore, the risk exists because of the quality of the employee, **there is liability only to the extent that the harm is caused by the quality of the employee that the employer had reason to believe would be likely to cause harm.** However, it is not necessary that the precise nature of the injury alleged by the third-party plaintiff would have been foreseen by the employer. . . .
>
> Whether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law.

*Id.* at 362, 819 P.2d 587 (emphasis added) (citation omitted).[9]

Defendant contends it is entitled to summary judgment on plaintiff's negligent retention claim because plaintiff has not "come forth with a definitive allegation of the identity of the employee(s) negligently retained and individualized allegations that Defendant had or should have had knowledge of a specified particular quality or propensity which led the employee(s) to injure Plaintiff."

---

9. While an action for intentional infliction of emotional distress is predicated on the vicarious liability of the employer for the actions of its employees (an issue left unaddressed by the par-

ties), liability in an action for negligent retention is direct in nature, being based on the **employer's** failure to act.

(Doc. 45, p. 24). In response, plaintiff sets forth the following four allegations, identifying specific individuals and conduct, as the predicates for his negligent retention claim.

First, plaintiff claims Bruce Bennett, leadman in the grind and polish area, should have taken action to protect plaintiff when he heard Marcus Pousson, plaintiff's assistant foreman, refer to plaintiff as "black boy." Second, plaintiff claims Mr. Pousson should have taken protective action when he heard six or seven people telling racially derogatory jokes in the company lunchroom. Third, plaintiff claims Michael Wyer, plaintiff's shop foreman, should have taken protective action when he learned of Mr. Pousson's alleged water fountain comment. Fourth and finally, plaintiff claims Mr. Wyer should have taken protective action when he learned that Arley Philbrick, plaintiff's foreman, had threatened to throw a rag soaked in lacquer thinner on plaintiff.

▮▮ Applying the test set forth in *Kansas State Bank, supra,* (a case which plaintiff has not cited), plaintiff's four allegations are clearly insufficient to support a claim of negligent retention under Kansas law. The first three events which plaintiff alleges should have resulted in "protective action" being taken, whether considered separately or together, could not reasonably be viewed as presenting any "**undue** risk of harm." Moreover, with respect to all four alleged events, there is no evidence of a resulting harm that was "**reasonably foreseeable**" from the employer's standpoint. For example, even though Philbrick's alleged thinner-soaked rag threat signalled a possible risk of harm to plaintiff, there is no evidence that defendant was aware of a "quality" [10] of Philbrick that

would cause it to foresee that Philbrick would threaten to harm plaintiff or some other employee. There is no evidence that Philbrick had done something comparable in the past, and thus, even assuming that Philbrick did threaten plaintiff, it appeared to be only an isolated event. Finally, there is no evidence that, after the alleged threat was made, Philbrick ever did anything that resulted in injuries to plaintiff—that is, no evidence that any harm was actually caused by Reno's retention of Philbrick as an employee.

Accordingly, summary judgment is granted on plaintiff's "third cause of action."

### Assault and Battery

In his "Fourth Cause of Action," plaintiff claims defendant failed to protect him from the harassment and assaults and batteries of fellow employees and seeks to recover for "injuries, pain and suffering and damages resulting in his permanent disability." (Doc. 1, ¶ 29). Defendant contends it is entitled to summary judgment on this claim because plaintiff's remedies for the alleged assaults and batteries lie exclusively under the Kansas Workers Compensation Act (KWCA).

▮▮ The court agrees with defendant. Plaintiff has **already** recovered for "his permanent disability" (as referred to in his fourth cause of action) by obtaining workmen's compensation benefits under the KWCA. (Doc. 46, Ex. 23). It is well established that physical injuries resulting from a job-related assault and battery are compensable under the KWCA.[11] *Springston v. IML Freight, Inc.,* 10 Kan.App.2d 501, 704 P.2d 394 (1985) (discussing *Brannum v.*

---

**10.** The Kansas Supreme Court does not define this term. However, the court did not quarrel with the Kansas Court of Appeals' decision affirming a jury instruction which stated "words such as 'incompetent' or 'unfit' refer to personal qualities, characteristics or propensities which one could reasonably anticipate would create an unreasonable risk of harm to others." *Hollinger v. Stormont Hosp. & Training School for Nurses,* 2 Kan.App.2d 302, 309, 578 P.2d 1121, *rev. denied,* 225 Kan. 844 (1978). Although made aware of this decision by defendant's memorandum, plaintiff has not attempted to deal with it. It is obvious that a plaintiff seeking to prove a negligent retention claim must produce some

evidence of foreseeability. Plaintiff's failure to recognize and heed his obligation dooms his claim.

**11.** The court fully recognizes that an **assault** need not involve physical injuries or even physical touching to be actionable. All that is required is an "immediate apprehension of bodily harm." *Taiwo v. Vu,* 249 Kan. 585, 596, 822 P.2d 1024 (1991). However, plaintiff's fourth cause of action speaks only of assault and battery "resulting in his permanent disability." He has clearly already recovered for those in the form of workmen's compensation.

*Spring Lakes Country Club, Inc.*, 203 Kan. 658, 455 P.2d 546 (1969)). Hence, as defendant argues, the KWCA would appear to be plaintiff's exclusive remedy with respect to assault and battery. *See* K.S.A. § 44–501(b) (Supp.1992). Plaintiff seemingly acknowledges that fact in his response brief, conceding that he "will not request that the jury find that any party is liable for damages for the tort of battery as a separate cause of action." (Doc. 60, p. 54).[12] Summary judgment is accordingly granted on plaintiff's "fourth cause of action."

## Disability Discrimination Under the KAAD

■ In his "Fifth Cause of Action," plaintiff alleges that "[d]efendant, in terminating the employment of plaintiff, discriminated against plaintiff by reason of plaintiff's disability without reasonable accommodation in violation of the [KAAD]." Defendant contends it is entitled to summary judgment on this cause of action claim because, *inter alia*, plaintiff has repeatedly stated in sworn testimony that he has no "disability."

In order to recover for disability discrimination under the KAAD, an individual must show that he in fact has a disability. *See* K.S.A. § 44–1009 (declaring it unlawful for an employer to discriminate against a person because of his or her "disability"). K.S.A. § 44–1002(j) defines a "disability" as

(1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(2) a record of such an impairment; or

(3) being regarded as having such an impairment by the person or entity alleged to

have committed the unlawful discriminatory practice complained of.

In the present case, plaintiff has himself testified that his alleged ailments do not prevent him from undertaking any physical activity. (Plaintiff's Depo., p. 115). In fact, plaintiff's position is that he was fired despite the fact that defendant knew he was fully capable of performing all of the duties of a welder at Reno. (Plaintiff's Depo., p. 79; Plaintiff's Response Brief, Doc. 60, pp. 18, 59). He claims that he was actually fired because of his race and because Reno was unwilling to take appropriate corrective action against his harassers, not because of any disability. (This forms the basis of plaintiff's Title VII discharge claim). Nevertheless, plaintiff also claims he should be allowed to present a claim for disability discrimination, stating: "Assuming for the sake of argument that Reno Technology proves that Daniel Bernard had a disability, the question of whether Reno Technology had a duty to accommodate will inevitably arise." (Doc. 60, p. 61). That is, according to plaintiff, he should be allowed to pursue a disability discrimination claim even though he admittedly intends to prove at trial that he was not disabled! (Doc. 60, p. 60). The court finds this completely incongruous. Plaintiff cannot argue to a jury, on the one hand, that he has no disability and, on the other hand, that his disability should have been accommodated. Summary judgment is accordingly granted on plaintiff's "fifth cause of action."[13]

## Intentional Infliction of Emotional Distress

In his "sixth cause of action," plaintiff seeks recovery for severe emotional distress allegedly inflicted upon him by his co-work-

12. Actually, plaintiff's only argument with respect to the assault and battery claim is that he should be allowed to prove at trial that a battery was committed against him as part of the evidence supporting his cause of action for intentional infliction of emotional distress. (*See* Doc. 60, pp. 53–54). That issue will be discussed *infra*.

13. It should be noted that the third prong of the definition of "disability"—being regarded by an employer as having an impairment with respect to a major life activity—does not apply to the present case. Although Mr. Breunig and Mr. English apparently did, based on the work re-

strictions prescribed by Dr. Hanson, regard plaintiff as having a condition which prevented him from performing certain functions, prong (3) is intended to encompass those situations in which an employee regards someone as disabled based on certain stereotypes or myths, not a situation where a person is regarded as having limitations because a doctor has said so. *See* H.R.Rep. No. 485, Part 3, 101st Cong., 2d Sess. at 30 (1990), U.S.Code Cong. & Admin.News 1990, 267 (reporting on the Americans With Disabilities Act which contains a similar definition of the term "disability").

ers at Reno. (Doc. 1, ¶¶ 31–32). Defendant contends this action fails as a matter of law because plaintiff has not presented sufficient evidence of **outrageous** conduct and **severe** emotional distress.

This court recently reviewed Kansas law regarding intentional infliction of emotional distress claims against employers in *West v. Boeing Co.*, 843 F.Supp. 670, 677 (D.Kan. 1994):

> The torts of outrage or intentional infliction of emotional distress have been clearly defined by the Kansas Supreme Court:

>> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. Proof of four elements is required to establish the cause of action: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

>> Liability for extreme emotional distress has two threshold requirements which must be met and which *the court* must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.

> *Roberts v. Saylor*, 230 Kan. 289, 292–93, 637 P.2d 1175 (1981) (citations omitted) (emphasis added). Although "[n]o bodily harm to the plaintiff is required to support such an action," "liability may only be found in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* "[L]iability does not arise from mere insults, indignities,

threats, annoyances, petty expressions, or other trivialities." *Id.* at 293, 637 P.2d 1175. "Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind." *Id.*

In applying these standards, "[t]he overwhelming majority of Kansas cases have held in favor of defendants on the outrage issue, finding that the alleged conduct was insufficiently 'outrageous' to support the cause of action." *Lindemuth v. Goodyear Tire and Rubber Co.*, [19 Kan.App.2d 95, 100–01, 864 P.2d 744 (1993) ] (string citing past Kansas cases with explanatory parentheticals). Moreover, "Kansas courts have been [particularly] reluctant to extend the outrage cause of action to [discrimination claims, including] claims of sexual harassment, arising in the employment setting." *Laughinghouse v. Risser*, 754 F.Supp. 836, 843 (D.Kan.1990) (string citing a number of cases).

In a footnote, the court reviewed two Kansas cases in which intentional infliction of emotional distress claims had been upheld in the employment context. *Id.* at 677 n. 5. First, in *Laughinghouse v. Risser*, 754 F.Supp. 836, 843 (D.Kan.1990), a sexual harassment case, plaintiff along with other former employees testified that the defendant employer had continually harassed and terrorized plaintiff over a two-year period, including "screaming and cursing," "unwanted touchings and sexual comments," and "fits of rage which included throwing things and tearing up files," because plaintiff would not sleep with him. Second, in *Gomez v. Hug*, 7 Kan.App.2d 603, 604–05, 645 P.2d 916 (1982), a racial harassment case, the defendant verbally accosted the plaintiff employee with vulgar racial slurs ("fucking spic" and "fucking Mexican Greaser"), grossly offensive insults ("pile of shit" and "damn fool"), and intense threats of physical violence (pounding fist on table and shaking fist in plaintiff's face) over a period of several days.

■ Turning to the present case, the court's initial inquiry is to determine whether the alleged incidents of racial harassment

against plaintiff constitute extreme and outrageous conduct, as defined by the Kansas Supreme Court. In the court's view, none of the incidents, taken individually, is "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Roberts v. Saylor*, 230 Kan. 289, 293, 637 P.2d 1175 (1981). The alleged racial slurs ("black boy," "nigger rig," the water fountain comment, and the unidentified jokes), two of which were neither directed at plaintiff nor even occurred in his presence, are certainly nothing like the "vituperation" and "vitriolic bullying" that occurred in *Gomez*, 7 Kan.App.2d at 610, 645 P.2d 916, and are alone insufficient to sustain plaintiff's claim, *see Bradshaw v. Swagerty*, 1 Kan.App.2d 213, 216, 563 P.2d 511 (1977) (finding trial court was "fully justified" in regarding epithets "nigger," "bastard" and "knot-headed boy" as " 'mere insults' of the kind which must be tolerated in our rough-edged society"). Likewise, most of the alleged pranks of plaintiff's co-workers (changing the settings on plaintiff's arc welder, banging a hammer on his work table, and placing a pointed object in his chair) are simply not the sort of "atrocious and utterly intolerable" acts the cause of action for intentional infliction of emotional distress is intended to address. *Roberts*, 230 Kan. at 293, 637 P.2d 1175. Arguably, Mr. Philbrick's alleged threat to throw a thinner-soaked rag around plaintiff's neck while he was using his welder would be considered "outrageous" by many, but even this act, alone, would seem insufficient. Nevertheless, taking all of the incidents as a whole, a continued pattern of constant hostilities directed at plaintiff in his place of work, where plaintiff was the only black, is revealed. Viewing plaintiff's evidence cumulatively, as it was viewed in *Laughinghouse* and *Gomez*, the alleged incidents of harassment stack up, brick upon brick, and, in the court's view, are enough to satisfy the first threshold requirement under *Roberts*.[14]

The court's second inquiry is to consider whether plaintiff has produced sufficient evidence of emotional distress so extreme that the law must intervene and so severe that no reasonable person should be expected to endure it. *Roberts*, 230 Kan. at 293, 637 P.2d 1175. Assuming the veracity of plaintiff's allegations, the court is unable to find, for purposes of summary judgment, that a reasonable person in plaintiff's position would not have suffered some emotional distress. The issue, however, is the **severity** of that distress. In this respect, plaintiff claims that he is "still hurting over being discriminated against," "upset and distressed," and "no longer able to live comfortably." (Plaintiff's Depo., pp. 390–91). He claims to have trouble getting a "solid night's sleep" and that "it's hard for [him] to do as [he] did before," talking to whomever and going wherever he pleased. (*Id.* at 391). His wife backs up this claim, observing that plaintiff is "not outgoing and all like he used to be." (Julie Bernard's Depo., p. 24). Plaintiff also claims to have been "scared and distraught" and to have an exacerbated "fear of fire" as a result of the threat by Mr. Philbrick.[15] (*Id.* at 384–89).

If the court was the fact-finder, it would be inclined to reject plaintiff's claims of severe and extreme emotional distress, finding them largely unworthy of credence. Plaintiff admits that he has not sought any psychological counseling for his alleged distress, claiming he could not afford to do so, and concedes that he has not even talked to his wife about his alleged distress. (*Id.* at 389). In fact, according to plaintiff's wife, although plaintiff was "upset," his alleged distress has not affected his relationship with her, his daughter, or with other family members and friends, and plaintiff is almost back to normal. (Julie

---

14. The court reaches this conclusion despite plaintiff's counsel's brief which, for some inexplicable reason, almost completely ignores Kansas law and instead cites a litany of cases and a 1965 law review article that have no precedential value in this case and which, as defendant aptly demonstrates, are far less persuasive than plaintiff's counsel would have this court believe. Where relevant and controlling authorities do exist, counsel would be well-advised to cite and analyze those cases.

15. Plaintiff's fear of fire apparently originally emanates from a childhood experience in which his sister was burned. (Plaintiff's Depo., pp. 384–85).

Bernard's Depo., pp. 23–25). Nevertheless, this court is not in the position of judging any party's credibility, and will not do so here. For purposes of summary judgment, the court finds that the overall nature of the harassment that was allegedly directed at plaintiff was sufficiently shocking and outrageous to give rise to an inference of severe emotional distress. *See Taiwo v. Vu,* 249 Kan. 585, 596, 822 P.2d 1024 (1991) ("In our opinion, the enormity of the outrage created by Ms. Vu's conduct is sufficient to satisfy the second threshold requirement of severe and extreme mental distress.").

■ Defendant also contends that it is entitled to summary judgment on plaintiff's cause of action for intentional infliction of emotional distress because the damages plaintiff seeks to recover, like those sought in connection with plaintiff's assault and battery claim, are compensable exclusively under the KWCA.

The KWCA provides:

Except as provided in the workers compensation act, no employer, or other employee of such employer, shall be liable for any injury for which compensation is recoverable under the workers compensation act nor shall an employer be liable to any third party for any injury or death of an employee which was caused under circumstances creating a legal liability against a third party and for which workers compensation is payable to such employer.

K.S.A. § 44–501(b) (Supp.1992). "Injuries for which compensation is recoverable under the workers compensation act" are any "personal injury by accident arising out of and in the course of employment." K.S.A. § 44–501(a) (Supp.1992). As stated *supra,* such injuries include **physical** injuries that are the result of an assault by a co-worker. *Springston v. IML Freight, Inc.,* 10 Kan.App.2d at 502–03, 704 P.2d 394. **Mental** injuries, however, are not "personal injuries" within the meaning of the KWCA unless they follow and can be directly traced to a **physical** injury. *Love v. McDonald's Restaurant,* 13 Kan. App.2d 397, 401, 771 P.2d 557 (1989); *Adamson v. Davis Moore Datsun, Inc.,* 19 Kan. App.2d 301, 307, 868 P.2d 546 (1994).

Defendant contends that the physical injury to plaintiff's buttocks is "at the core" of his cause of action for intentional infliction of emotional distress and, therefore, as with his claim for assault and battery, plaintiff's only mode of recourse is under the KWCA. Plaintiff contends otherwise, arguing that his action for intentional infliction of emotional distress seeks in essence to recover damages for non-physical as opposed to physical injuries.

There are no Kansas cases directly addressing this issue. However, Professor Larson, author of the preeminent national authority on workmen's compensation law, has offered this analysis:

If the essence of the tort, in law, is nonphysical, and if the injuries are of the usual non-physical sort, with physical injury being at most added to the list of injuries as a make weight, the suit should not be barred. But if the essence of the action is recovery for physical injury or death, including in "physical" the kinds of mental or nervous injury that cause disability, the action should be barred even if it can be cast in the form of a normally non-physical tort.

2A Larson, *Law of Workmen's Compensation* § 64.45(a), at 13–180 (1993). A number of courts have followed Professor Larson's analysis in cases similar to the present one and found that civil actions seeking to recover damages for emotional distress are not precluded by exclusive remedies provisions in workmen's compensation acts absent a direct tie between the physical and mental injuries. *See, e.g., Lapinad v. Pacific Oldsmobile–GMC, Inc.,* 679 F.Supp. 991, 994–95 (D.Hawaii 1988) (contrasting action for intentional infliction of emotional distress with action for assault and battery—similar to this case—and noting that "in the case of intentional infliction of emotional distress, there is an entire class of harms which are left uncompensated under worker's compensation"); *Vigil v. Safeway Stores, Inc.,* 555 F.Supp. 1049, 1050–51 (D.Colo.1983) (holding intentional infliction of emotional distress claim not precluded when based mainly on mental suffering and humiliation, and only peripherally on physical pain and suffering); *Iverson*

*v. Atlas Pacific Engineering,* 143 Cal.App.3d 219, 229, 191 Cal.Rptr. 696, 703 (1983) ("Where, as here, intentional physical acts, ratified by the employer, allegedly cause non-compensable harm primarily emotional in nature, we conclude that the exclusive remedy provisions do not preclude civil claims."); *Broaddus v. Ferndale Fastener Division,* 84 Mich.App. 593, 599, 269 N.W.2d 689, 692 (1978) (holding claim for mental anguish not precluded because "not an action for mental damages incidentally resulting from an industrial injury").

Applying Professor Larson's analysis to the case at bar, the court finds that plaintiff's action for intentional infliction of emotional distress is not precluded by K.S.A. § 44–501(b) because "the essence" of the tort alleged is "non-physical" and "the injuries are of the usual non-physical sort, with physical injury being at most added to the list of injuries as a make weight." Larson, *supra.* Although some portion of plaintiff's alleged severe emotional distress may arguably be attributable to or connected with the physical injury to his buttocks and therefore compensable under the KWCA, for the most part, plaintiff's claims of mental injuries appear to be a result of the cumulative effect of all of the alleged incidents of harassment, only one of which involved any physical contact. Certainly, it would be difficult to directly trace all of plaintiff's alleged severe emotional distress to his getting poked in the rear end. *See Love,* 13 Kan.App.2d at 401, 771 P.2d 557. Hence, plaintiff's claim for intentional infliction of emotional distress seeking damages for injuries solely mental in nature must be allowed to go forward, or else his mental injuries will be left largely uncompensated. *See Lapinad, supra,* 679 F.Supp. at 995. Defendant's motion for summary judgment on plaintiff's "sixth cause of action" is accordingly denied.

**IT IS ACCORDINGLY ORDERED** that defendant's motion for partial summary judgment (Doc. 44) is hereby **granted** with respect to the second, third, fourth, and fifth causes of action in plaintiff's complaint and **denied** with respect to his sixth cause of action for intentional infliction of emotional distress.

A motion for reconsideration of this order is **not** encouraged. Should such a motion be filed, it shall comply strictly with the standards set forth in *Comeau v. Rupp,* 810 F.Supp. 1172 (D.Kan.1992), and shall be limited to 5 pages, including exhibits and attachments, if any. A response shall be similarly limited. No reply shall be filed.