No. 74,710

PENNY S. GLEASON, *Appellant*, v. SAMARITAN HOME and
CHURCH MUTUAL INSURANCE CO., *Appellees*.

(926 P.2d 1349)

Opinion filed November 8, 1996.

*Steven Hornbaker,* of Harper, Hornbaker, Altenhofen & Opat, Chartered, of Junction City, argued the cause and was on the brief for appellant.

*Matthew S. Crowley,* of Gehrt & Roberts, Chartered, of Topeka, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

DAVIS, J.: This case is a workers compensation appeal. The claimant, Penny S. Gleason, appeals from a Workers Compensation Board (Board) decision that she did not prove functional impairment or permanent partial general disability. Three of the issues raised by the claimant challenge the findings and conclusions of the Board, and two issues deal with the constitutionality of the Workers Compensation Act, as amended by the legislature following our decision in *Sedlak v. Dick,* 256 Kan. 779, 887 P.2d 1119 (1995).

On September 20, 1989, while working within the scope of her employment as a licensed practical nurse for the Samaritan Home, the claimant was struck in the right shoulder/clavicular area by a

patient. The claimant called the company doctor, Dr. Glenn O. Bair, who prescribed ibuprofen, pain medicine, and a muscle relaxer. The claimant testified that she began feeling pain later in that day and called Dr. Bair again.

During her first appointment with Dr. Bair on September 22, 1989, the claimant reported a dull ache from her shoulder down the back of her arm. She continued to see Dr. Bair, who prescribed ibuprofen, Darvocet, and Flexeril and advised the claimant not to work. X-rays taken on October 2, 1989, of her cervical spine, right shoulder, and right elbow were found to be normal. Physical therapy was ordered by Dr. Bair.

Dr. Bair referred the claimant to Dr. Vinod N. Patel, a neurologist, who in turn administered an electromyogram which revealed an "[e]ntirely normal right upper extremity." Dr. Bair also referred the claimant to Dr. C.J. Yoon, who after examination of the claimant described her range of motion and motor function to be normal. Dr. Yoon concluded that the claimant demonstrated upper trapezius muscle tenderness but that this condition was not severe. He suggested physical therapy on an outpatient basis, heat, ultrasound, and strengthening exercises prior to her returning to her job.

An MRI (magnetic resonance imaging) test was conducted on the claimant in November 1989, which revealed minimal bulging of the disc at C 5-6, but no disc herniation or significant stenosis. Dr. Patel reevaluated the claimant on November 14, 1989. Upon finding that her condition had significantly improved, he suggested avoidance of neck strain.

At the request of Dr. Bair, the claimant was again examined by Dr. Yoon. He conducted an EMG and nerve conduction study, which indicated a right C 5-6 radiculopathy. Dr. Yoon recommended physical therapy with cervical traction and a soft cervical collar. In January 1990, Dr. Yoon concluded that the claimant was not responding to conservative treatment and should be seen by a neurosurgeon.

An examination on February 20, 1990, by Dr. Craig H. Yorke, a neurosurgeon, confirmed a subtle disc bulge but this abnormality was not sufficient to explain the degree of discomfort the claimant

claimed. Dr. Yorke found the claimant's motor, sensory, and reflex examinations in the lower and upper extremities normal, normal range of motion in the cervical spine, and no atrophy in the right deltoid muscle or right arm. He tested for thoracic outlet syndrome and found that while the radial pulse diminished in the claimant's right arm, the symptoms were not reproduced. Dr. Yorke suggested that the claimant probably had thoracic outlet syndrome and that her best approach would be exercises to improve that syndrome.

The claimant was also sent to Dr. C.A. Lang, an anesthesiologist, who conducted a series of stellate ganglion blocks with the hope of easing the claimant's pain. However, these treatments only resulted in temporary pain relief.

In September 1990, the claimant was seen by Dr. Philip E. Mills, who "saw no evidence of any neurological dysfunction." The claimant had an MRI of her head in September 1990, the results of which were negative except for a nonspecific finding of a focal, small, nonspecific high intensity signal within the right lateral thalamus.

On November 6, 1990, the claimant was examined by Dr. Eric Hansen. He found the claimant had full range of motion without pain in her cervical spine and all four extremities; she had full strength throughout all four extremities and other aspects were within normal limits. Dr. Hansen ruled out reflex sympathetic dystrophy (RSD) and recommended a bone scan; if the bone scan was negative, he suggested the claimant proceed to a chronic pain program for 3 weeks. A bone scan was conducted in November 1990 to rule out RSD. The scan was negative, showing no evidence of RSD in the upper right extremity.

The claimant participated in the pain program in January 1991. The program was successful in reducing the claimant's pain, and she was recommended for a work fitness program; she was agreeable to a work re-entry plan. The claimant told Dr Hansen that she intended to follow up with Dr. Bair on an evaluation for possible multiple sclerosis. Dr. Hansen counseled her that multiple sclerosis did not appear to be work-related with regard to her right shoulder injury and that she should participate in the work fitness program

so that she could return to gainful employment. The claimant did not pursue the work fitness program while undergoing the evaluation for multiple sclerosis.

In January 1991, Dr. Bair referred the claimant to Dr. Frederick Wolfe, of Wichita, whom Dr. Bair described as one of the foremost authorities on fibromyalgia. Based upon his May 1991 examination, Dr. Wolfe concluded that the claimant had post-traumatic fibromyalgia but also concluded that the diagnosis was not necessarily exclusive in that it occurs with other pain syndromes. Dr. Wolfe suggested that the claimant receive an evaluation at a pain clinic and that further medical evaluations and tests would be unproductive.

However, Dr. Wolfe later revised his diagnosis based upon further examination of the claimant. He found that in a subsequent visit, the claimant no longer met the criteria for fibromyalgia. At the time of her second examination, the tender points used to diagnosis her condition of fibromyalgia had decreased from eleven to one.

In November 1991, the claimant underwent a psychiatric evaluation conducted by Dr. W.G. Phillips. Dr. Phillips noted that the claimant had a number of traumatic difficulties as a child. Dr. Phillips stated that the claimant's physical symptoms appeared after a period of stress and showed a neurotic pattern of adjustment. He also found that she might have a problem of an addictive nature regarding addictive substances. Dr. Phillips wrote:

"She is utilizing somatic complaints to deal with her frustrations and is experiencing difficulty functioning in a constructive and/or successful manner. I feel that the injury she received at the nursing home was only incidental and not the etiology of her problems. If she is going to resolve these issues she will have to make a commitment to face the problems which she experienced for a number of years, discontinue all of the pain medications and accept the fact that she needs to return to some type of gainful employment. It would not be in her best interest to continue to be disabled and to facilitate her effort to do this would not be medically indicated and/or appropriate."

The record of the claimant's workers compensation claim also included depositions of the claimant, Dr. Phillips, Dr. Bair, Dr. Wolfe, Monty Longacre, a vocational rehabilitation specialist, two

of the claimant's family members, and a former co-worker of the claimant's at the Samaritan Home. Longacre testified that based on reports of Dr. Bair, Dr. John Wertzberger, and other doctors, he did not think the claimant could work at all, even at a sedentary job, since she had never done so on a full-time basis before. The claimant's relatives testified they had observed deterioration in her physical condition since the accident.

In an order dated January 7, 1994, the Administrative Law Judge (ALJ) found the claimant suffered from either fibromyalgia syndrome or a hysterical emotional reaction to the accident due to a borderline personality disorder. The ALJ found the record supported the conclusion that the claimant suffered some component of both diagnoses. Because the claimant had not yet achieved maximum medical improvement, the ALJ found her temporarily totally disabled.

In an order of May 19, 1994, the Board found that while the claimant proved a temporary fibromyalgia condition, she failed to prove any permanent functional impairment. Accordingly, the Board awarded the claimant $28,773.45 based upon 115.54 weeks of temporary total compensation at $249.03 per week. The Board further concluded that the testimonies of Dr. Phillips and Dr. Wolfe were the more credible and that they both had indicated it would be in the claimant's best interest to return to work: "Claimant is denied additional permanent partial disability compensation stemming from the September 20, 1989, injury."

For her first three issues challenging the decision of the Board, the claimant contends: (1) The decision is not supported by substantial competent evidence; (2) the decision incorrectly applies the law dealing with psychological injuries; and (3) the decision erroneously excluded the testimony of a vocational expert under K.S.A. 44-519 by concluding that a nontestifying expert's records and opinions could not be used by other experts in rendering their opinions.

## (1) SUBSTANTIAL COMPETENT EVIDENCE

The 1993 amendments to the Workers Compensation Act specifically adopt the Kansas Act for Judicial Review and Civil En-

forcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, for workers compensation appeals. K.S.A. 1995 Supp. 44-556. The KJRA further states that such review shall be limited to questions of law. K.S.A. 1995 Supp. 44-556(a). The determination of whether the Board's findings of fact are supported by substantial competent evidence is a question of law. *Berry v. Boeing Military Airplanes*, 20 Kan. App. 2d 220, 222-23, 885 P.2d 1261 (1994). "In workers compensation cases, substantial evidence is ' "evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved." [Citation omitted.]' " *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 285, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

Three health care providers provided testimony by way of deposition on the issue of the claimant's disability. Dr. Bair saw the claimant many times over a 2-year period, during which he referred her to a variety of specialists for testing and assistance in reaching a diagnosis and treatment. None of the tests, including x-rays, MRI's, and bone scans, revealed a definite diagnosis. Dr. Bair finally referred the claimant to Dr. Wolfe for possible diagnosis of fibromyalgia since Dr. Bair himself had diagnosed this syndrome once before.

Dr. Wolfe found that the claimant had fibromyalgia, but later found she no longer met the criteria for that syndrome. Dr. Wolfe concluded that the claimant ought to return to work. Dr. Phillips, after his psychiatric examination of the claimant, concluded that her problems stemmed from her psychiatric condition and that she should discontinue her pain medications and return to gainful employment.

Consistent with its fact-finding powers, K.S.A. 1995 Supp. 44-556(a), the Board found the testimony of Dr. Phillips and Dr. Wolfe to be the more credible testimony than the testimony of Dr. Bair, which it found somewhat improbable. Thus, the Board concluded that the claimant "failed to prove . . . that she suffered any permanent functional impairment or any ongoing permanent work disability *as a result of this incident*." (Emphasis added.) We

conclude that the decision of the Board is supported by substantial competent evidence.

## (2) PSYCHOLOGICAL INJURIES

The claimant argues that the Board erroneously denied her claim for compensation for the psychological injury allegedly arising from the September 20, 1989, incident. Both parties agree, as did the Board, that the pertinent standard is:

"Where there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis, conversion hysteria, or hysterical paralysis, the full disability including the effects of the neurosis is compensable." *Adamson v. Davis Moore Datsun, Inc.*, 19 Kan. App. 2d 301, Syl. ¶ 2, 868 P.2d 546 (1994).

However, the neurosis must be caused by the physical injury in order to establish a compensable claim.

"In order to establish a compensable claim for traumatic neurosis under the Kansas Workers Compensation Act, K.S.A. 44-501 *et seq.*, the claimant must establish: (a) a work-related physical injury; (b) symptoms of the traumatic neurosis; and (c) that the neurosis is directly traceable to the physical injury." *Love v. McDonald's Restaurant*, 13 Kan. App. 2d 397, Syl., 771 P.2d 557, *rev. denied* 245 Kan. 784 (1989).

The Board denied the claimant's request for compensation for the psychological injury and concluded:

"[I]n order to find either functional impairment or permanent partial general disability, credible evidence must be presented to prove claimant's loss. As the more credible evidence shows that the claimant has suffered neither permanent functional impairment nor a work disability, claimant is not entitled to [an] additional award in this matter."

The applicable standard of review is the substantial competent evidence test, in which the evidence is viewed in the light most favorable to the prevailing party. See *Reeves v. Equipment Service Industries, Inc.*, 245 Kan. 165, 173, 777 P.2d 765 (1989). The crux of the Board's decision regarding psychological injury is its underlying conclusion that the claimant "suffered [no] permanent functional impairment or any ongoing permanent work disability *as a result of this incident.*" (Emphasis added.) Traumatic neurosis is not compensable under the Workers Compensation Act absent a

work-related physical injury. *Followill v. Emerson Electric Co.*, 234 Kan. 791, 795-96, 674 P.2d 1050 (1984). Implicit in the conclusion of the Board is that the neurosis or psychological disability is not directly traceable to the physical injury. As noted above, the Board's conclusion is supported by substantial competent evidence.

## (3) EXPERT'S RECORDS AND OPINIONS

The only testimony regarding the claimant's ability to obtain work in the open labor market and to earn a comparable wage was that of Monty Longacre, a vocational expert, who found the claimant to be 100% restricted in both her ability to earn a comparable wage and her ability to perform work in the open labor market. However, the Board concluded:

"Mr. Longacre's opinion is based upon the medical reports of Dr. Glen O. Bair, which the Appeals Board has found less than credible, and upon the reports of Dr. John Wertzberger, whose medical records were never placed into evidence. (K.S.A. 44-519) As such, the opinion of Mr. Longacre will not be considered credible as Mr Longacre was not provided the medical records of Dr. Phillips or Dr. Wolfe in reaching his opinion regarding claimant's work disability."

The claimant argues that the Board erred in refusing to admit Longacre's testimony, which was based on a medical report by Dr. Wertzberger, who did not testify and whose report was not admitted into evidence. The claimant challenges the Board's application of the following provisions of K.S.A. 44-519:

"No report of any examination of any employee by a health care provider, as provided for in the workers compensation act and no certificate issued or given by the health care provider making such examination, shall be competent evidence in any proceeding for the determining or collection of compensation unless supported by the testimony of such health care provider, if this testimony is admissible, and shall not be competent evidence in any case where testimony of such health care provider is not admissible."

We need not resolve whether the provisions of K.S.A. 44-519 exclude Longacre's report in this case. Once the Board concluded, based upon the medical evidence of record, that "the claimant has failed to prove by a preponderance of the credible evidence that she suffered any *permanent* functional impairment or any *ongoing*

*permanent* work disability as a result of this incident" (emphasis added), the issue of "work disability" becomes irrelevant. As noted above, the conclusion of the Board that the claimant's disability claims are of a temporary nature is supported by substantial competent evidence. Thus, her future ability to obtain work in the open labor market and to earn a comparable wage in the open labor market are immaterial.

The claimant raises two additional constitutional issues. She contends that (1) the legislature in reconstituting the Board usurped the power of the Supreme Court and (2) the 1993 amendment to K.S.A. 1992 Supp. 44-556, which eliminated judicial review by trial de novo in the district court, is unconstitutional.

## (1) Whether the Legislature In Reconstituting the Board Usurped the Power of the Supreme Court

The claimant argues that the Board was without jurisdiction to review the decision of the ALJ because Section 5 of S.B. 59 is unconstitutional as a violation of separation of powers. In order to place this issue in context, a brief summary of recent legislative and judicial history is necessary.

In *Sedlak v. Dick*, 256 Kan. 779, 887 P.2d 1119 (1995), we held that the provisions of K.S.A. 44-555b, providing for the appointment of the Board's members, was a constitutionally impermissible delegation of legislative authority. 256 Kan. at 803. The fatal flaw in the statute was that it gave the AFL-CIO and the Kansas Chamber of Commerce and Industry the absolute power to select Board members. 256 Kan. at 802. Upon declaring the Board unconstitutional, the *Sedlak* court ordered all claims pending before the Board or on appeal to this court to be transferred to the appropriate district court for further proceedings. 256 Kan. at 805-06. *Sedlak* was decided January 13, 1995.

The legislature quickly passed remedial legislation to cure the constitutional defects in the Board's appointment process. Provisions in this legislation addressed pending cases:

"New Sec. 5. (a) Any workers compensation appeals which have been transferred from the workers compensation board to a district court or the director of workers compensation pursuant to the Kansas Supreme Court's order in *Sedlak*

*v. Dick*, case no. 70,792 (January 13, 1995) and have not been decided by the director or the district courts shall be transferred to the workers compensation board established under section 1 from the district court or the director on the effective date of this act.

"(b) Any workers compensation appeals which have been transferred from the court of appeals to the district courts pursuant to the Kansas Supreme Court's order in *Sedlak v. Dick*, case no. 70,792 (January 13, 1995) and have not been decided by the district courts shall be transferred to the court of appeals on the effective date of this act.

. . . .

"Sec. 7. This act shall take effect and be in force from and after its publication in the Kansas register." S.B. 59 (L. 1995, ch. 1, §§ 5, 7).

S.B. 59 was published in the Kansas Register on January 26, 1995. 14 Kan. Reg. 106 (1995). Section 5 is now K.S.A. 1995 Supp. 44-556a.

The claimant initially filed a request for review of the ALJ's decision with the Board on January 14, 1994. The Board issued an order on May 19, 1994. The claimant filed an appeal with the Court of Appeals, No. 71,998, on June 14, 1994. The Kansas Supreme Court decided *Sedlak* on January 13, 1995, after the claimant's appeal was pending before the Court of Appeals. A few days after *Sedlak* was decided, the Court of Appeals issued a stay of all appeals from the Board that were pending in the Court of Appeals in order for *Sedlak* to become final and to allow the legislature to pass remedial legislation. Less than 2 weeks later, on January 26, 1995, S.B. 59 became effective. After that, the Court of Appeals lifted the stay and set the pending cases, including the claimant's case, on dockets without immediately transferring them to a district court.

On May 12, 1995, the Court of Appeals issued its decision in the claimant's case, remanding the matter to the "new" Board created by S.B. 59 for review of the ALJ's decision. *Gleason v. Samaritan Home*, No. 71,998, unpublished opinion filed May 12, 1995. In that case, the court stated:

"The status of this case is not precisely covered by the remedial legislation. It is not in a district court at this time, and it would not be sensible to transfer it there only to have it transferred back to this court. The constitutional issue was resolved in *Sedlak*, and the court found in that case that the Board's rulings were invalid. The Board's ruling in this case is therefore invalid, leaving nothing which

can presently be resolved by this court. However, Gleason has prevailed on the constitutional challenges she has asserted and should be afforded some relief as a result."

In other words, by the time the Court of Appeals addressed the claimant's earlier appeal and similarly situated cases, the remedial legislation was in place. It made no sense to transfer those cases to a district court as directed in *Sedlak*, only to have them immediately transferred back again pursuant to S.B. 59. In the claimant's case, the only Board-level decision that had been made at that point had been made by the unconstitutional "old" Board. Thus, in order for there to be a constitutionally valid decision for the Court of Appeals to review, there needed to be a decision made by the "new" Board. Accordingly, the Court of Appeals remanded the claimant's case, and others, to the "new" Board for review of the respective ALJ orders.

## SEPARATION OF POWERS

The claimant argues that "the Legislature had no power to overrule the Supreme Court's order that all existing matters pending before the unconstitutional Appeals Board should be remanded to the district court." By passing Section 5 of S.B. 59, which requires that such pending matters be transferred to the "new" Board, the claimant suggests that the legislature violated the doctrine of separation of powers.

The claimant's argument mischaracterizes the procedural facts. This was not a case that was "transferred from the workers compensation board to the district court," and then transferred to the new Board pursuant to Section 5(a) of the new legislation. It did not come before the new Board by virtue of S.B. 59. Rather, it came before the new Board by order of the Court of Appeals. However, to the extent that the claimant contends that the legislature undermined or interfered with the *Sedlak* decision by passage of S.B. 59, we will address the claimant's separation of powers contention.

Recently, the Court of Appeals rejected a very similar separation of powers argument in *Stuart v. Douglas County*, 21 Kan. App. 2d 784, 907 P.2d 919 (1995), *rev. denied* 259 Kan. ___ (1996). In

*Stuart*, the claimant injured her elbow, for which the ALJ found a 65% permanent partial general disability. The Board upheld the disability rating but ruled that Stuart was an employee of the county, not the state. The county appealed to the Court of Appeals. By the time the case reached the Board level, it was reviewed by the "new" Board. The County argued to the Court of Appeals that the Board had lacked jurisdiction due to its failure to transfer the case to the district court, pursuant to *Sedlak*. The Court of Appeals rejected that argument, stating:

"[B]y the time the Board issued its order on February 13, 1995, the remedial legislation had cured the Board's constitutional problems: The Board had jurisdiction, and its failure to transfer the case to a district court was harmless. The legislation would have required the case to be transferred right back to the Board." 21 Kan. App. 2d at 787.

The sources and limitations of the federal and state government differ profoundly: "Federal legislative power derives solely from the federal Constitution; a state legislature is ' "free to act except as it is restricted by the state constitution." ' [Citations omitted.]" *Sedlak*, 256 Kan. at 791.

As to the doctrine of separation of powers, however, the Kansas Constitution is almost identical to the federal Constitution. *State, ex rel., v. State Office Building Commission*, 185 Kan. 563, 569-70, 345 P.2d 674 (1959). The doctrine of separation of powers is an inherent and integral element of the republican form of government and is expressly guaranteed to the states by the federal Constitution. *State v. Mitchell*, 234 Kan. 185, 193-94, 672 P.2d 1 (1983) (quoting *Van Sickle v. Shanahan*, 212 Kan. 426, 447, 511 P.2d 223 [1973]).

"Generally speaking, the legislative power is the power to make, amend, or repeal laws; executive power is the power to enforce the laws; and the judicial power is the power to interpret and apply the laws to actual controversies." *State ex. rel. Stephan v. Finney*, 251 Kan. 559, Syl. ¶ 3, 836 P.2d 1169 (1992). Judicial power has also been defined as "the power to hear and determine a cause and the rights of the parties to a controversy, and to render a binding judgment or decree based on present or past facts under existing laws." *Mitchell*, 234 Kan. at 194.

In *Board of Greenwood County Comm'rs v. Nadel*, 228 Kan. 469, 618 P.2d 778 (1980), the appellant taxpayer challenged a change in the law that allowed county-level taxing authorities to bring appeals following decisions by the Board of Tax Appeals (BOTA) in favor of taxpayers. Prior to the change in the law, counties could not appeal BOTA orders that favored taxpayers to district court. In Nadel's case, he paid taxes under protest, and BOTA decided he was due a refund. The county appealed to the district court, which applied the "old" law in effect at the time and dismissed the case. The county ultimately appealed the dismissal to the Supreme Court, where the trial court's decision was initially affirmed. Then, the Supreme Court agreed to a rehearing. While the decision on rehearing was pending, the new law took effect. The Supreme Court applied the new law, which expressly applied retroactively, to reinstate the county's appeal to the district court.

One of the issues raised by the taxpayer in *Nadel* was that the legislature's enactment of the new law violated the separation of powers doctrine. Nadel argued that the legislature had interfered in the arena of judicial power. We disagreed, ruling:

"[T]he Kansas Constitution gives to the district and appellate courts jurisdiction to hear appeals, such as may be provided by law. The legislature, under constitutional provisions previously cited, has been given the power to grant, limit and withdraw the appellate jurisdiction to be exercised by the courts. [Citations omitted.]" 228 Kan. at 479.

Even more directly on point, we held:

"The legislature has full authority to establish procedural prerequisites to the exercise of jurisdiction by the district courts over administrative appeals." 228 Kan. 469, Syl. ¶ 5.

The conclusion that the legislature may permissibly pass laws regulating judicial jurisdiction was further affirmed in *State v. Mitchell*, 234 Kan. 185. The *Mitchell* court specifically endorsed *Nadel* and said: "Jurisdiction is a legislative matter. The procedure conferring that jurisdiction is therefore also legislative." 234 Kan. at 195.

The doctrine of separation of powers was not violated in this case by the legislature deciding the scope of appellate jurisdiction

over administrative appeals. It is well within the legislative domain to set such rules to the extent that the legislature does not encroach onto the courts' "traditional, independent decision-making power." *Mitchell*, 234 Kan. at 195. The provisions of S.B. 59, which determine the appropriate forum for appealing the decisions of the ALJ in workers compensation cases (specifically those which had previously been subject to review by the unconstitutional "old" Board), do not exceed the constitutional powers of the legislature.

The claimant relies on *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. ___, 131 L. Ed. 2d 328, 115 S. Ct. 1447 (1995). In *Plaut*, the United States Supreme Court held that § 27A(b) of the Securities Exchange Act of 1934 was unconstitutional to the extent that it allowed reinstatement of cases that had been finally dismissed under the applicable statute of limitations prior to the enactment of § 27A(b). 131 L. Ed. 2d at 356.

The *Plaut* Court stated:

"When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly. [Citations omitted.] . . . Having achieved finality . . ., a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was." 131 L. Ed. 2d at 347-48.

The claimant argues that S.B. 59 nullified the final order of the *Sedlak* decision. This argument fails for several reasons. As noted in *Plaut*, a decision of an inferior court is not a final decision until the period for appeal has run and the case has not been appealed or the case has been appealed and finally adjudicated. 131 L. Ed. 2d at 347-48. See also *Nadel*, 228 Kan. at 473 (holding that there can be no vested right in an existing law which precludes the law's change or repeal.) *Cf., Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 366, 892 P.2d 497 (1995) (indicating an exception to this rule for changes in substantive law, whereas the present case involves procedural changes).

At the time that S.B. 59 became effective, the claimant's appeal was still pending and was not a final decision. In fact, S.B. 59

expressly limits its application to cases that "have not been decided by the director or the district courts." Thus, S.B. 59 did not nullify any final order of the judicial department. As noted in *Plaut*, at every level, the court must decide according to law in existence at the time the decision is rendered. 131 L. Ed. 2d at 348.

The claimant argues that S.B. 59 nullified the effect of the remand order. As noted above, however, the remand order was not a final decision in those cases subject to the remand. Additionally, the remand order was the logical and necessary result of the *Sedlak* court finding the Board unconstitutional. The Board was unconstitutional and the cases had to be decided by some adjudicative body; the *Sedlak* court could not foresee whether the legislature would pass remedial legislation or what procedure that legislation might prescribe.

In passing S.B. 59, the legislature was addressing the problem recognized in *Sedlak*, not circumventing the *Sedlak* holding or subverting this court's authority. The legislature did not attempt to controvert a particular judicial decision on a past controversy. See *Nadel*, 228 Kan. at 480.

Finally, this court has stated that the question of whether the old procedure or new procedure applies in a given workers compensation case is determined by the date "the order appealed" was entered, not the date of injury. *Rios v. Board of Public Utilities of Kansas City*, 256 Kan. 184, Syl. ¶ 3, 883 P.2d 1177 (1994). The Court of Appeals has correctly concluded that K.S.A. 1995 Supp. 44-556(c), which provides that orders entered prior to October 1, 1993, shall be reviewed under the old procedure and new procedures apply after October 1, 1993, should be read to mean the date of the ALJ's award (as opposed to a subsequent order by the Director or Board). *University of Kansas v. Department of Human Resources*, 20 Kan. App. 2d 354, 360, 887 P.2d 1147 (1995); *McClure v. Rodricks*, 20 Kan. App. 2d 102, Syl. ¶ 2, 883 P.2d 1228 (1994).

The ALJ's order in this case was issued on January 7, 1994. As such, the new procedure applies, which prescribes an appeal to the new Board—the exact forum to which the Court of Appeals remanded this case and which ultimately heard this appeal. S.B. 59,

§ 5, which prescribes the appropriate forum for cases affected by the *Sedlak* decision, does not violate the doctrine of separation of powers.

(2) Whether the 1993 Amendment to K.S.A. 1992 Supp. 44-556 Which Eliminated Judicial Review by Trial De Novo in the District Court Is Unconstitutional.

The appellate court presumes a statute to be constitutional and resolves all doubts in favor of validity; a statute must clearly violate the constitution before it will be struck down. *Sedlak*, 256 Kan. at 793.

(a) Due Process

The claimant has not focused her argument on due process principles, but rather she emphasizes the alleged potential for improper political influence on the new Board. To understand the claimant's concern, a brief review of the new process of selecting board members is helpful. In *Sedlak*, we declared the earlier act unconstitutional because it delegated absolute authority for the selection of Board members to two private organizations, the Kansas AFL-CIO and Kansas Chamber of Commerce and Industry. 256 Kan. 779, Syl. ¶ 4. Under the earlier law, the Secretary of Human Resources could only refuse their nominee if that person did not meet the selection requirements. The 1995 legislative amendments retain the nomination process by those two groups, but allow the Secretary to either appoint the committee's nominee or reject the nomination and request another at his or her discretion. Under the amendments, the same board members chosen under the unconstitutional system remain in office. K.S.A. 1995 Supp. 44-555c(f)(1), (2).

The claimant's main argument is:

"Under the current statute, the ultimate finder of fact in this and all other workers compensation cases is not an independent district court judge, elected or appointed by an open and impartial process, but a panel of political appointees (selected in secret by representatives of private trade groups, whom most Kansans have no voice in choosing) who have no permanency in office and no fixed salary, and who must periodically weather the displeasure of these two (2) mutually hostile trade groups in order to keep their jobs."

The claimant cites to Alexander Hamilton in support of "the vital importance of preserving the independence of ultimate fact finders".

"Basic elements of procedural due process of law are notice and an opportunity to be heard at a meaningful time in a meaningful manner." *Peck·v. University Residence Committee*, 248 Kan. 450, 467, 807 P.2d 652 (1991). The claimant does not expressly allege that she has not had adequate notice or the opportunity to be heard. In fact, the present law provides adequate notice and opportunity to be heard. See K.S.A. 44-523. Her due process argument is more in the nature of a policy argument that the threat of undue political influence deprives one of the opportunity to be heard in a meaningful manner.

The claimant would have this court substitute its judgment on social policy for that of the legislature. We have directly addressed this argument in *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan 336, 357, 789 P.2d 541 (1990): "It [is] not within the province of this court to weigh the desirability of social or economic policy underlying a statute, or to weigh the beneficial results flowing from any particular legislative policy."

We also stated:

"Our constitution does not make this court the critic of the legislature; rather, this court is the guardian of the constitution and every legislative act comes before us with a presumption of constitutionality. . . . In determining whether a statute is constitutional, courts must guard against substituting their views on economic or social policy for those of the legislature." 246 Kan. at 348.

Implicit in the claimant's argument is the notion that the claimant has a vested right in the previous appeal procedures and any potential workers compensation award. Rights are vested when the right to enjoyment, present or prospective, has become the property of a particular person as a present interest. *Board of Greenwood County Comm'rs v. Nadel*, 228 Kan. at 473. "[A] mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right." 228 Kan. at 473-74. This rule is particularly applicable to procedural changes in the law, such as this one. See *Resolution Trust Corp. v. Fleischer*, 257 Kan. at 366.

## (b) Equal Protection

The claimant asserts without much support in her brief that the removal of de novo review from the district court is unconstitutional as a violation of equal protection.

The first step in an equal protection analysis is determining which level of scrutiny to apply to a statute which distinguishes between classes of individuals. *Leiker v. Gafford*, 245 Kan. 325, 362, 778 P.2d 823 (1989); see *Bair v. Peck*, 248 Kan. 824, 830, 811 P.2d 1176 (1991). Kansas courts have delineated three levels of scrutiny: (1) the rational basis test to determine whether a statutory classification bears some reasonable relationship to a valid legislative purpose; (2) the heightened scrutiny test to determine whether a statutory classification substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny test to determine whether a statutory classification is necessary to serve some compelling State interest. *Bair v. Peck*, 248 Kan. at 830-31 (citing *Farley v. Engelken*, 241 Kan. 663, Syl. ¶¶ 3, 4, 5, 740 P.2d 1058 [1987]).

It is not clear from the claimant's assertion how she believes the statutory amendments create different classes of parties. It appears she is arguing that the amendments create potential classes of workers compensation claimants: those who are subject to the pre-amended appeal procedures and those who are subject to the newly amended appeal procedures.

The equal protection clause does not prevent the legislature from treating different claims of parties differently; a legislative classification of a nonsuspect class will be upheld if the classification is rationally related to a legitimate legislative purpose. See *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1017-18, 850 P.2d 773 (1993).

The rational basis test has traditionally been applied where equal protection challenges have been brought against social and economic legislation. Statutory limitations on liability and recovery have been held to be social and economic legislation. *Leiker v. Gafford*, 245 Kan. at 363. The Workers Compensation Act, in addressing compensation available for injuries sustained by workers while acting within the scope of their employment, falls squarely

within this category; as such, the reasonable basis test applies. The rational or reasonable basis test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. *Leiker v. Gafford*, 245 Kan. at 363.

Assuming, arguendo, that the removal of de novo review from the district court constitutes different classes of persons for purposes of an equal protection analysis, it may easily be concluded that the legislature's chosen appeal procedures under the 1993 amendments are rationally related to its legitimate policy of "speedy adjustment of claims" under the Workers Compensation Act. *Cain v. Zinc Co.*, 94 Kan. 679, 681, 146 Pac. 1165 (1915). The 1993 amendments to the Workers Compensation Act which removed de novo review from the district court of the ALJ's order does not violate equal protection principles.

(c) Section 18 of the Kansas Constitution Bill of Rights

The claimant challenges the provision in the 1993 amendments to the Workers Compensation Act that eliminated de novo review of ALJ decisions from the district court. Instead, the new law gives an unsatisfied party the opportunity to appeal ALJ decisions to the Board. K.S.A. 1995 Supp. 44-551(b)(1). Orders of the Board are appealable to the Court of Appeals, and review is limited to questions of law. K.S.A. 1995 Supp. 44-556(a). Prior to the change, an ALJ's decision was appealed to the Director, and the Director's decision was appealed to the district court. The district court was expressly granted de novo review of the ALJ's decision, although such review was limited to the record. K.S.A. 1992 Supp. 44-556(a).

The only argument under Section 18 of the Kansas Constitution Bill of Rights as reflected in respondent's brief is that the legislature cannot abolish a right which existed at common law at the time of statehood (1861) unless it also provides an adequate substitute remedy for the right abolished. See *Bair v. Peck*, 248 Kan. at 839. Section 18 of the Kansas Constitution Bill of Rights provides: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

In enacting its change to the Workers Compensation Act, the legislature properly exercised its legislative power to grant, limit, and withdraw appellate jurisdiction to be exercised by the courts. See *Nadel*, 228 Kan. at 479. Section 18 of the Kansas Bill of Rights is not implicated. While the legislature eliminated district court review procedures by its new enactment, it merely replaced such procedure by authorizing the Board "to review all decisions, findings, orders and awards of compensation of administrative law judges." K.S.A. 44-555b(a). The Board's members under the new act must possess the same qualifications as a district judge. We noted in *Sedlak*: "The concept of utilizing qualified Board members experienced in the workers compensation field has merit." 256 Kan. at 802.

The right to a hearing and an opportunity to be heard has been preserved by the new enactment. Without question, the legislature is empowered to enact law relating to the scope of appellate jurisdiction over administrative appeals.

Affirmed.