Atcheson, J.,
concurring: Jason D. Kelsey has a right to seek DNA testing to challenge his convictions for aggravated indecent liberties with a child because the Jessica’s Law sentence he received makes him materially indistinguishable from criminals statutorily entitled to request such testing under Kansas law. K.S.A. 21-2512. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that sort of consistency in a state’s extension of rights or benefits. I agree with Judge Hill’s conclusion grounded in the Equal Protection Clause. *830 But the Kansas courts take an odd approach to analyzing equal protection claims by imposing a requirement that those persons asserting a denial of a government right or benefit first demonstrate they are “similarly situated” to tiróse receiving the right or benefit. That potentially dispositive threshold test has crept fog-lilce into our cases on little cat feet. It hasn’t a basis in generally accepted equal protection jurisprudence, and akin to a morning fog, it obscures the landscape to no particularly useful ends and conceivably dangerous ones.
The Equal Protection Clause prevents state and local governments from treating groups of people differently, whether through legislative enactment or other policies and practices, without some justification. See Engquist v. Oregon Dept. of Agriculture, 553 U.S. 591, 601, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008) (“Our equal protection jurisprudence has typically been concerned with governmental classifications that ‘affect some groups of citizens differently than others.’ ”) (quoting McGowan v. Maryland, 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393 [1961]); Reed v. Reed, 404 U.S. 71, 75-76, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971) (“The Equal Protection Clause . . . denfies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute.”); Jurado v. Popejoy Constr. Co., 253 Kan. 116, 123, 853 P.2d 669 (1993) (“[E]qual protection requires . . . that legislative classifications be reasonable, not arbitrary, and that they be justified by legitimate legislative objectives.”); see also Fitzgerald v. Rarnstable School Comm., 555 U.S. 246, 257, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) (Equal Protection Clause applies to public school admissions policies). The nature of the classification or division dictates the degree of justification the governmental entity must advance for its action. The United States Supreme Court has recognized three levels of review or scrutiny for equal protection challenges.
When a government classification burdens a fundamental right or divides based upon characteristics considered inherently suspect in granting benefits or imposing burdens—including race, national origin, and alienage—courts apply the most rigorous review, com *831 monly known as strict scrutiny. A classification survives strict scrutiny only if it furthers compelling government interests and is narrowly tailored to advance those interests. Plyler v. Doe, 457 U.S. 202, 216-17, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); Zablocki v. Redhail, 434 U.S. 374, 388, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); Bostic v. Schaefer, 760 F.3d 352, 375 & n.6 (4th Cir. 2014); Kitchen v. Herbert, 755 F.3d 1193, 1218 (10th Cir. 2014). A few other group characteristics, notably gender and illegitimacy, have been treated as “quasi-suspect,” invoking a heightened level of judicial review, though less demanding than strict scrutiny. See Clark v. Jeter, 486 U.S. 456, 461, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988); Hayden v. Greensburg Community School, 743 F.3d 569, 577 (7th Cir. 2014) (gender); Pierre v. Holder, 738 F.3d 39, 50 (2d Cir. 2013) (gender and legitimacy). Courts require statutes distinguishing among people on quasi-suspect bases to be “substantially related to an important governmental objective.” Clark, 486 U.S. at 461; see Morales-Santana v. Lynch, 804 F.3d 520, 528 (2d Cir. 2015). That requires the actual purpose for or justification of the statute’s differential treatment to be “exceedingly persuasive.” United States v. Virginia, 518 U.S. 515, 532-33, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996); see Morales-Santana, 804 F.3d at 528; Hayden, 743 F.3d at 577. But most economic and social regulation affects neither a fundamental right nor a protected class characteristic. In those instances, courts apply a relaxed, “rational basis” review to an equal protection challenge. See Vacco v. Quill, 521 U.S. 793, 799, 117 S. Ct. 2293, 138 L. Ed. 2d 834 (1997); Kwong v. Bloomberg, 723 F.3d 160, 172 (2d Cir. 2013). A government classification survives rational basis review if “ ‘a plausible policy reason’ ” supports the scheme and it is not so removed from that reason as to result in an “ ‘arbitrary or irrational’ ” distinction. Fitzgerald v. Racing Assn. of Central Iowa, 539 U.S. 103, 107, 123 S. Ct. 2156, 156 L. Ed. 2d 97 (2003) (quoting Nordlinger v. Hahn, 505 U.S. 1, 11-12, 112 S. Ct. 2326, 120 L. Ed. 2d 1 [1992]); see Heller v. Doe, 509 U.S. 312, 319-20, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993); State v. Cheeks, 298 Kan. 1, 9, 310 P.3d 346 (2013). The statute or other regulation may be upheld for any justifiable purpose; the purpose need not be the one that prompted its adop *832 tion. See McDonald v. Board of Election, 394 U.S. 802, 809, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969); Estate of Kunze v. Commissioner of Internal Revenue, 233 F.3d 948, 954 (7th Cir. 2000).
The United States Supreme Court has been clear about how equal protection challenges should be analyzed. A court should first determine the appropriate level of review: rational basis, intermediate scrutiny, or strict scrutiny. And the court should then apply that standard to evaluate tire constitutional propriety of the governmental classification in light of the regulatory purposes or objectives. See Armour v. City of Indianapolis, 566 U.S. _, 132 S. Ct. 2073, 2079-81, 182 L. Ed. 2d 998 (2012); Attorney General of N.Y. v. Soto-Lopez, 476 U.S. 898, 906 & n.6, 106 S. Ct. 2317, 90 L. Ed. 2d 899 (1986) (plurality); 476 U.S. at 924 (O’Connor, J., dissenting, joined by Rehnquist, J. and Stevens, J.); Dunn v. Blumstein, 405 U.S. 330, 335, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972). The Court does not engage in a preliminary inquiry asking whether the groups created by a statute are “similarly situated” (and, in turn, dispense with any further analysis if they are not). In San Antonio School District v. Rodriguez, 411 U.S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973), the Court outlined the appropriate approach to an equal protection challenge:
“We must decide, first, whether the Texas system of financing public education operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. ... If not, the Texas scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute [a] . . . violation of the Equal Protection Clause of tire Fourteenth Amendment.”
To arrive at tire correct level of scrutiny, a court necessarily must assess how the governmental action classifies, thereby defining the characteristics that set tire disadvantaged group apart from the benefited group or identifying a fundamental right that has been impinged. But that is nothing like a potentially dispositive comparison of the groups to decide if they are somehow sufficiently similar.
For the most part, lower courts define the first task in equal protection analysis to be a determination of the applicable degree of scrutiny—to tire extent they explicitly describe the sequencing *833 of the steps at all. See, e.g., Connelly v. Steel Valley School Dist., 706 F.3d 209, 213 (3d Cir. 2013) (“We begin by considering which equal protection standard governs our review. . . . ”); Doe v. Pennsylvania Bd. of Probation and Parole, 513 F.3d 95, 107 (3d Cir. 2008) (“In reviewing a claim that government action violates the Equal Protection Clause, we must first determine the appropriate standard by which we are to review the claim.”); Hedgepeth v. Washington Metropolitan Area Transit Authority, 386 F.3d 1148, 1153 (D.C. Cir. 2004) (“The first step in analyzing [the] claim that this disparate treatment violated equal protection is to determine the proper level of scrutiny.”); Breck v. State of Michigan, 203 F.3d 392, 395 (6th Cir. 2000); Richard v. Hinson, 70 F.3d 415, 417 (5th Cir. 1995).[1] The Kansas Supreme Court has described the analytical method that way, too. See, e.g., Gleason v. Samaritan Home, 260 Kan. 970, 988, 926 P.2d 1349 (1996) (“The first step in an equal protection analysis is determining which level of scrutiny to apply to a statute which distinguishes between classes of individuals.”); Bair v. Peck, 248 Kan. 824, 830, 811 P.2d 1176 (1991).
The Kansas Supreme Court, however, has drifted from that established equal protection jurisprudence to incorporate a new threshold test requiring that the constituents of the classifications created by a statute or other government action be “similarly situated” to advance a constitutional claim. The origins of that criterion are murky. And, as I discuss, the notion serves no useful purpose. The court recognized the proposition in State v. Salas, 289 Kan. 245, 248, 210 P.3d 635 (2009), and cited Hodges v. Johnson, 288 Kan. 56, 72, 199 P.3d 1251 (2009), State v. Denney, 278 Kan. 643, 652, 101 P.3d 1257 (2004), and Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985), for support.
But Hodges neither directly states nor actually applies such a test. In Denney, the court considered an equal protection challenge from an individual convicted of aggravated sodomy who wanted postconviction testing of DNA evidence, although K.S.A. 21-2512 *834 granted testing only to persons convicted of rape and murder. The court undertook an initial comparison of the elements of aggravated criminal sodomy applicable to Denney, pronounced them “arguably indistinguishable” from the elements of rape, and then extended DNA testing to Denney because the legislative classification permitting testing in rape convictions but not convictions for at least some forms of sodomy lacked any rational basis. Denney, 278 Kan. at 652-54, 656. The Denney decision cited no authority for its “threshold” examination of the elements of the crimes as a prerequisite to the traditional equal protection analysis. 278 Kan. at 653-54. The comparison of the statutory elements would have been a significant part of a traditional analysis—if the elements of the crimes were markedly different, that would likely provide a rational basis for the legislature allowing DNA testing for convictions of one and not the other.
In outlining the applicable constitutional principles, Denney relies almost exclusively on Mudd v. Neosho Memorial Regional Med. Center, 275 Kan. 187, 62 P.3d 236 (2003). But Mudd uses traditional equal protection analysis identifying the level of scrutiny and then assessing the appropriateness of the governmental classification in light of that standard. 275 Kan. at 197-200. The case does not suggest some preliminary step based on a comparison of the attributes of the constituents in the groups created by the classification.
In Cleburne, 473 U.S. at 439, the Court described tire Equal Protection Clause as “essentially a direction that all persons similarly situated should be treated alike.” The description, however, summarized the purpose of the provision rather than an analytical tool for assessing an asserted equal protection violation. The Court, however, did turn immediately to. ¾ discussion pf those tools and outlined, among other things, rational basis review, intermediate scrutiny, and strict scrutiny. 473 U.S. at 439-42. But the Court never mentioned a threshold requirement for a comparison establishing substantial similarity across the governmental classification or how that comparison might be undertaken. Nor did it make such a comparison in deciding the equal protection issue.
*835 The Kansas Supreme Court also used a threshold “similarly situated” test in In re Tax Appeal of Weisgerber, 285 Kan. 98, 106, 169 P.3d 321 (2007), ostensibly because the Equal Protection Clause prohibits government regulation treating “ Arguably indistinguishable’ classes of people differently.” (Quoting Ross v. Moffitt, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 [1974].) The court also cited Reed, 404 U.S. at 75-76, as supporting that approach. But Ross and Reed—like Cleburne—simply summarized the constitutional right afforded in the Equal Protection Clause and not the analytical method for evaluating those claims. In fact, the classes can be different in ways having nothing to do with the government’s purpose in creating the classification itself and nonetheless violate the Equal Protection Clause. A classification runs afoul of the constitutional protection if, taking account of the applicable level of scrutiny, the classes created cannot be fairly distinguished with respect to the benefit bestowed or the burden imposed. The Reed decision said as much: “A classification ‘must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.’ ” 404 U.S. at 76 (quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 [1920]).
More recently, the Kansas Supreme Court has continued to apply a gatekeeper “similarly situated” test for equal protection claims by citing its own cases coming after Weisgerber and Salas as authority. See, e.g., Miller v. Johnson, 295 Kan. 636, 666, 289 P.3d 1098 (2012) (citing Board of Miami County Comm’rs v. Kanza Rail-Trails Conservancy, Inc., 292 Kan. 285, 315, 255 P.3d 1186 [2011]; State v. Huerta, 291 Kan. 831, 834, 247 P.3d 1043 [2011]); Kanza Rail-Trails Conservancy, Inc., 292 Kan. at 315 (citing Salas, 289 Kan. at 248); Huerta, 291 Kan. at 834 (citing Salas, 289 Kan. at 248). That sort of repetition doesn’t strengthen an otherwise doubtful rule, especially one construing federal constitutional law. [2]
*836 The United States Supreme Court neither endorses nor applies the analytical approach the Kansas Supreme Court now follows. If Cleburne, Ross, or Reed actually imposed an initial “similarly situated” requirement, the Court would have used that criterion in deciding later equal protection cases. But plainly, the Court has not. There isn’t a hint of such a condition in its decisions. See Armour, 132 S. Ct. at 2079-80; Romer v. Evans, 517 U.S. 620, 631, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996). The ruling in Cleburne actually contravenes the notion. 473 U.S. at 447-48 (Although recognizing the intellectually disabled “as a group are indeed different from others not sharing their misfortune,” the Court found no rational basis for a municipal regulation requiring a special use per *837 mit for a group home for the intellectually disabled when no comparable approval was necessary for other communal housing arrangements including convalescent or nursing homes, sororities and fraternities, and boarding houses.).
Ultimately, a state court cannot add a potentially dispositive element to federal equal protection law any more than it could jettison strict scrutiny or declare sex to be a classification undeserving of heightened review. See State v. Lawson, 296 Kan. 1084, 1089, 297 P.3d 1164 (2013) (United States Supreme Court decisions controlling on matters of federal constitutional law); State v. Galaviz, 296 Kan. 168, 180, 291 P.3d 62 (2012).
In most equal protection cases, the Kansas analytical model-—• requiring an initial showing that the government action results in “similarly situated” classes—probably makes no difference in the outcome. That would be true here. But the added and potentially dispositive preliminary step is more than an academic exercise. Depending on how the test is supposed to be applied, it would make a substantive difference in some cases. And it necessarily distracts from and confounds a proper evaluation of equal protection claims.
If the similarly situated test applies to the overall characteristics of one class as compared to the overall characteristics of the other class or classes created by a statute or other governmental action, the standard would effectively terminate some equal protection claims that ought to go forward. That sort of comparison would be an abstract one unrelated to the purpose of the governmental classification. At least some of the Kansas caselaw suggests an abstract comparison. See Salas, 289 Kan. at 251; Weisgerber, 285 Kan. at 106.
Under that approach, for example, Cleburne presumably would have come out differently. As I have indicated, the Court determined that intellectually disabled adults, as a group, differed significantly from those with roughly normal intellectual capacity. See Cleburne, 473 U.S. at 448. Under the Kansas criteria for analyzing equal protection challenges—assuming the initial comparison to be an abstract one-—that should have ended the case in the city’s favor. But, of course, the Court found an equal protection violation, *838 precluding the city from enforcing its permit requirement against the group home.
Similarly, in Heller v. Doe, 509 U.S. 312, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993), the United States Supreme Court considered an equal protection challenge to Kentucky’s involuntary commitment procedures because, among other differences, they imposed a more rigorous standard of proof for committing tire mentally ill than for the intellectually disabled. The Court recognized substantial differences between the mentally ill as a class and the intellectually disabled as a class, particularly concerning institutional care and treatment. 509 U.S. at 326-28. But that recognition did not terminate the case. The Court reviewed the differences in procedure using a rational basis test and found them to be constitutionally permissible under the Equal Protection Clause. 509 U.S. at 328.
The test would also seem to lead to doubtful results in some equal protection claims challenging sex-based classifications. Suppose, for example, a relatively small municipality required firefighters to meet specific strength and fitness standards to graduate from the training academy, and few women, even after the training, could do so. The fire chief proposed and the city commission adopted the standards to avoid hiring female firefighters because they thought it would be bad for departmental cohesiveness and would likely require at least some renovation of the fire station’s facilities. So the municipality has a written policy allowing only men between 19 and 26 years old to apply to be firefighters. A woman files suit attacking the men-only application criterion as an equal protection violation. The government regulation plainly creates a disfavored class of women and a favored class of men—with a purpose of denying a benefit to women based on their sex. But men and women arguably aren’t similarly situated. They have demonstrable anatomical differences. And they have significantly different roles in the procreative process. Normatively, men are, in fact, bigger and stronger than women. Some women are fitter and stronger than some men, and some (but not veiy many) women could meet the municipality’s training standards. Arguably, at least, *839 those differences would be enough to cut off the equal protection claim under the Kansas test.
But doing so would eliminate any consideration of the heightened, intermediate scrutiny required for classifications based on sex. The more rigorous equal protection review likely would defeat the municipality’s argument that the men-only policy promotes administrative convenience and saves costs because few women could meet the strength and fitness requirements even with training, so permitting them to apply at all would be wasteful. The physical requirements themselves could be attacked under the heightened standard as a product of intentional discrimination rather than as job-appropriate in some rational way. The equal protection claim would be a meritorious one.[3]
The Kansas test, then, could short-circuit proper equal protection review and has the potential to prematurely terminate legitimate claims. Moreover, the initial “similarly situated” determination seems to be one without an objective or even cognizable measure. That criterion looks to be an empty vessel in which a court can pour whatever it wants.
Even if the similarly situated criterion were to be applied within the context of the challenged governmental classification, so that die nature of the division and its ostensible purpose inform the determination, the test serves no good purpose. Evaluating the similarities and differences between the classes created by the government action essentially replicates much of what a court is supposed to do under traditional equal protection analysis after establishing the appropriate level of scrutiny. See Armour, 132 S. Ct. at *840 2079-82 (Court reviews for rationality city’s justifications for change in assessing costs of sewer projects, resulting in forgiveness of some property owners’ unpaid assessments but no refunds to other property owners who had already paid assessments); Rodriguez, 411 U.S. at 17; Reed, 404 U.S. at 75-76. There is no reason for a court to take up part of that task before fixing the applicable scrutiny. Doing so, at the very least, fragments tire analytical process without lending any clarity or other benefit to the decision-making. But in those cases calling for heightened scrutiny, the effect could be significantly distorting, since the court would be reviewing the impact of the governmental classification without fully considering whether the differences created are justified by especially persuasive reasons.
Today, I am comfortable that we have come to the correct conclusion in applying the Equal Protection Clause to the issue before us. But I would prefer following a path less foggy to get there.

 In the for what it’s worth department, Chief Justice of tire United States John Roberts wrote Hedgepeth during his time on the federal appellate bench.

 Also in the for what it’s worth category, the Kansas Supreme Court suggested a “similarly situated” prerequisite for equal protection claims in Bonin v. Vannaman, 261 Kan. 199, 223, 929 P.2d 754 (1996), and Smith v. Printup, 254 *836 Kan. 315, 321-22, 866 P.2d 985 (1993). In Bonin, Justice Abbott cited only Smith for that notion. And in Smith, Justice Davis cited no direct authority in affirming the dismissal of an equal protection claim in two paragraphs. But several years later in Gleason, 260 Kan. at 988, Justice Davis expressly outlined and applied a traditional equal protection analysis beginning with an identification of the governing level of scrutiny. Justice Abbott, however, continued to treat the “similarly situated” test as the initial step in equal protection analysis. See Injured Workers of Kansas v. Franklin, 262 Kan. 840, 857, 942 P.2d 591 (1997) (obliquely referring to Smith, 254 Kan. at 321, but citing no other authority). Threads of Smith influenced the court in Weisgerher, 285 Kan. at 104, 107. The Kansas courts have hopscotched around in addressing the analytical model for equal protection claims over the past quarter centuiy.
The Kansas Supreme Court, however, is not alone in that respect. For example, some panels of the United States Court of Appeals for the Fourth Circuit use a comparable “similarly situated” test as the initial step in assessing equal protection claims. See Sansotta v. Town of Nags Head, 724 F.3d 533, 542 (4th Cir. 2013); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). Other panels do not and, rather, adhere to conventional equal protection analysis. See United States v. Timms, 664 F.3d 436,445 (4th Cir. 2012); Greenville Women’s Clinic v. Bryant, 222 F.3d 157, 203 (4th Cir. 2000). The Morrison decision appeal's to be the fountainhead for the test. The panel cited Cleburne, 473 U.S. at 439-40, and two earlier Fourth Circuit cases as authority. But Cleburne does not recognize or support the notion. Nor do the earlier circuit cases. In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 471 (4th Cir. 1999) (equal protection claim properly dismissed because plaintiffs failed to show any disparate treatment); Sylvia Development Corp. v. Calvert County, Md., 48 F.3d 810, 818-20 (4th Cir. 1995) (government action must purposefully classify in an impermissible way to violate Equal Protection Clause).

 The scenario also violates Title VII, 42 U.S.C. § 2000e et seq. (2012), prohibiting employment discrimination based on sex and other protected characteristics. But Title VII claims have a comparatively short limitations period and administrative exhaustion requirements that constitutional equal protection claims do not. Title VII also does not apply to veiy small employers. So an aggrieved party may have a viable equal protection claim without a companion Title VII claim. Liability issues aside, Title VII significantly limits noneconomic damages against smaller employers. 42 U.S.C. § 1981a(a)(l), (b)(3) (2012). There are no comparable caps on damages for equal protection violations by state governmental entities brought under 42 U.S.C. § 1983.